Sean E. Brearcliffe (AZ Bar No. 016861)
RUSING LOPEZ & LIZARDI, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Email: sbrearcliffe@rllaz.com
Telephone: (520) 792-4800
Facsimile: (520) 529-4262

Raymond P. Niro *(Pro Hac Vice)*
Raymond P. Niro, Jr. *(Pro Hac Vice)*
Brian E. Haan *(Pro Hac Vice)*
Daniel R. Ferri *(Pro Hac Vice)*
NIRO, HALLER & NIRO
181 W. Madison St., Suite 4600
Chicago, Illinois 60602
Email: rniro@nshn.com
Email: rnirojr@nshn.com
Email: bhaan@nshn.com
Email: dferri@nshn.com
Telephone: (312) 236-0733
Facsimile: (312) 236-3137

*Counsel for JEDI TECHNOLOGIES, INC.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jedi Technologies, Inc., an Arizona corporation,<br><br>                         Plaintiff,<br><br>     vs.<br><br>SpeedDate.com, Inc., a Delaware corporation,<br><br>                       Defendant. | Case No. 4:11-cv-00304-TUC-JGZ<br><br>**PLAINTIFF JEDI TECHNOLOGIES, INC.'S OPENING *MARKMAN* BRIEF** |

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ................................................................................. 1

II.  THE PATENTS-IN-SUIT ..................................................................... 2

III.  THE ACCUSED SPEEDDATE.COM WEBSITE .................................. 2

IV.  APPLICABLE LEGAL STANDARDS .................................................. 3

V.  JEDI'S PROPOSED CLAIM CONSTRUCTIONS ................................. 7

A.  '098 Patent, Claim 4, "automated display of human participant-specific data" and "automatically displaying at least a portion of the sorted human participant specific data to at least one participant" ...................................... 7

B.  '098 Patent, Claim 4, "real-time network" .................................. 10

C.  '098 Patent, Claim 4, "collecting human participant specific data"; and '977 Patent, Claim 1, "collecting user specific data and preferences" ................ 12

D.  '098 Patent, Claim 4, "presenting to the human participant an on-line survey" ............................................................................ 15

E.  '098 Patent, Claim 4, "processing the stored human participant specific data, using the compatibility criteria" ......................................... 16

F.  '098 Patent Claim 4, '977 Patent Claim 1, "compatibility criteria" .......... 18

G.  '098 Patent, Claim 4, "to determine interpersonal compatibility between at least two network participants" ................................................ 20

H.  '098 Patent, Claim 4, '977 Patent Claim 1, "compatibility criteria [that] includes at least one characteristic and a threshold" .............................. 21

I.  '098 Patent, Claim 4, "applying the compatibility criteria to a plurality of records" ......................................................................... 23

J.  '098 Patent, Claim 4, "wherein the participant specific data includes a chat time a first participant is available to chat" ...................................... 24

K.    '098 Patent, Claim 4, "to solicit an auto-response indicating whether the compatible participant wishes to chat with said first participant during the time indicated as available to chat" ............................................................... 25

L.    '098 Patent, Claim 7, "personality trait derived from data provided by the user"; '098 Patent, Claim 8, "psychological personality trait" ................... 27

M.    '977 Patent, Claim 1, "automatically prompting" ....................................... 29

N.    '977 Patent, Claim 1, "accessing pre-existing data associated with a user"; '977 Patent, Claim 1, "where the pre-existing data is available prior to initiation of collecting data for the user" .................................................... 31

O.    '977 Patent, Claim 1, "and thereby indicating interpersonal compatibility between the users" ........................................................................................ 32

P.    '977 Patent, Claim 2, "publicly available" ................................................. 33

VI.    CONCLUSION ..................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*3M Innovative Prop. Co. v. Avery Dennison Corp.*,
    350 F.3d 1365 (Fed. Cir. 2003) ............................................................... 4

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
    345 F.3d 1318 (Fed. Cir. 2003) ..................................................... 4, 7, 17

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,
    616 F.3d 1249 (Fed. Cir. 2010) ............................................................. 23

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006) ............................................................... 24

*BMC Res., Inc. v. Paymentech, L.P.*,
    498 F.3d 1373 (Fed. Cir. 2007) .................................................... 9, 15, 27

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002) ........................................................... 8, 11

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008) ................................................... 5, 19, 25

*Desper Prods., Inc. v. QSound Labs*,
    157 F.3d 1325 (Fed. Cir. 1998) ............................................................... 7

*Gemstar-TV Guide Int'l, Inc. v. ITC*,
    383 F.3d 1352 (Fed. Cir. 2004) ............................................................... 5

*General Electric Co. v. Sonosite, Inc.*,
    580 F. Supp. 2d 743 (W.D. Wis. 2008) .................................................. 21

*GolfSwitch Inc. v. TeeConnect, LLC*,
    2008 U.S. Dist. LEXIS 111252 (D. Ariz. Aug. 1, 2008) ...................... 13, 15

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
    355 F.3d 1327 (Fed. Cir. 2004) ......................................................... 6, 19

*Howmedica Osteonics Corp. v. Wright Medical Tech., Inc.*,
    540 F.3d 1337 (Fed. Cir. 2008) ................................................... 5, 19, 23

*Innogenetics, N.V. v. Abbott Labs.*,
    512 F.3d 1363 (Fed. Cir. 2008) ................................................... 5, 15, 19

*Innova/Pure Water v. Safari Water Filtration*,
  381 F.3d 1111 (Fed. Cir. 2004) .................................................. 13

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001) .................................................. 4

*Intervet Inc. v. Merial Ltd.*,
  617 F.3d 1282 (Fed. Cir. 2010) .................................................. 5

*Kara Tech. Inc. v. Stamps.com Inc.*,
  582 F.3d 1341 (Fed. Cir. 2009) .................................................. 17, 28

*Keithley v. The Homestore.com, Inc.*,
  2007 U.S. Dist. LEXIS 71126 (N.D. Cal. Sept. 10, 2007) .................................................. 21, 33

*Laryngeal Mask Co. Ltd. v. Ambu A/S*,
  618 F.3d 1367 (Fed. Cir. 2010) .................................................. 5

*Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*,
  445 F.3d 1348 (Fed. Cir. 2006) .................................................. 3

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) (*en banc*) .................................................. 4

*Mass. Inst. of Tech. v. Abacus Software*,
  462 F.3d 1344 (Fed. Cir. 2006) .................................................. 3

*Omega Eng'g, Inc. v. Raytek, Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) .................................................. 6

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .................................................. passim

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999) .................................................. 7

*Rexnord Corp. v. Laitram*,
  274 F.3d 1336 (Fed. Cir. 2001) .................................................. 5

*SRI Int'l v. Matsushita Elec. Corp.*,
  775 F.2d 1107 (Fed. Cir. 1985) .................................................. 5

*SunRace Roots Enter. Co. v. SRAM Corp.*,
  336 F.3d 1298 (Fed. Cir. 2003) .................................................. 6

*Symantec Corp. v. Computer Assocs. Int'l, Inc.*,
  522 F.3d 1279 (Fed. Cir. 2008) ............................................................... 8, 29

*Synthes USA, LLC v. Diverse Surgical Supplies, Inc.*,
  2011 U.S. Dist. LEXIS 14074 (D. Ariz. Jan. 21, 2011) ................................. 12, 15, 27

*TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*,
  2011 U.S. Dist. LEXIS 5640 (D. Ariz. Jan. 12, 2011) ......................................... 12, 15

*W.E. Hall Co., Inc. v. Atlanta Corrugating, LLC*,
  370 F.3d 1343 (Fed. Cir. 2004) ............................................................. 4, 27

Pursuant to the Court's September 13, 2011 Scheduling Order, Dkt No. 24, Plaintiff Jedi Technologies, Inc. ("Jedi") hereby provides its Opening *Markman* Brief.

## I. INTRODUCTION

Plaintiff Jedi has charged Defendant SpeedDate.com, Inc. ("SpeedDate") with infringement of claims 4, 7, 8 and 13 of U.S. Patent No. 7,401,098 C1 (the "'098 Patent") and claims 1, 2 and 3 of U.S. Patent No. 7,885,977 B2 (the "'977 Patent"). The first step in resolving the issue of infringement is to determine the meaning of the disputed terms.

Pursuant to the Court's Scheduling Order, on October 25, 2011, the parties exchanged their respective identifications of claim terms that may require construction. Jedi identified two (2) terms/phrases. SpeedDate identified twenty-two (22) terms/phrases. Unable to reach a resolution on the proper meaning of most of these terms, the parties submitted their Joint Claim Construction Statement on December 12, 2011, identifying the twenty (20) terms that remain in dispute. (Dkt. No. 31).

Federal Circuit law requires that patent claims be construed based upon the plain and ordinary meaning of the claim terms themselves, consistent with the intrinsic evidence of record. Jedi has proposed constructions which abide by this legal framework. In contrast, SpeedDate has proposed constructions which are not supported by the intrinsic evidence of record, much less the plain and ordinary meaning of the claims themselves. SpeedDate's proposed claim constructions – all of which are presumably sought for the sole purpose of supporting SpeedDate's non-infringement contentions – are replete with violations of the basic canons of claim construction, and should be rejected by the Court.

## II. THE PATENTS-IN-SUIT

The '098 Patent, entitled "System and Method for the Automated Notification of Compatibility Between Real-Time Network Participants," originally issued on July 15, 2008. After a reexamination involving numerous additional items of prior art, the USPTO confirmed the validity on May 10, 2011 and issued the Ex Parte Reexamination Certificate. (Ex. A, '098 Patent and Ex Parte Reexam Cert.). The '977 Patent is a continuation of the '098 Patent, and issued on February 8, 2011. (Ex. B, '977 Patent).

Suppose that you join a dating website to meet new people and chat online. The dating website seems great in that it provides the opportunity to meet any of its thousands of members—but there are problems. First, how can you possibly look through the profiles of thousands of members for a compatible mate? Second, how can you be sure that a person you would like to meet will be available to chat? Third, the questions required to join the dating website are tedious and time-consuming to fill out, especially considering that you already did so for your Facebook account. The '098 Patent solves at least the first two dilemmas through the automated display of data for compatible people including emailing a compatible person to allow him or her to make a selection indicating whether he or she wishes to chat during the time indicated as available. The '977 Patent solves at least the last dilemma by collecting information including pre-existing data, such as by accessing a Facebook account for name or address information.

## III. THE ACCUSED SPEEDDATE.COM WEBSITE

Although claims are not construed to determine whether they cover an accused method, the Federal Circuit has emphasized that claim construction should be done with

at least some knowledge of the accused method. *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1350-1351 (Fed. Cir. 2006); *Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*, 445 F.3d 1348, 1350 (Fed. Cir. 2006). When the Court is deprived of this "vital contextual knowledge," claim construction runs the risk of taking on the attributes of an advisory opinion. *Lava Trading*, 445 F.3d at 1350. It is therefore entirely appropriate, if not necessary, for the Court to have a basic understanding of the accused website.

An exemplary chart setting forth how claim 4 of the '098 Patent applies to Defendant's website www.speeddate.com and its Apple iPad and iPhone applications is attached as Exhibit C. SpeedDate collects its members' data, stores member responses to questions regarding "Who I'd Like to Meet," processes the stored data using compatibility criteria, sorts and matches members, and emails compatible participants including statements like "She's online now, and she's looking forward to meeting you!" and "Are you interested in Amanda? YES / NO." (Ex. C, '098 Patent Claim Chart).

An exemplary chart setting forth how claim 1 of the '977 Patent applies to Defendant's website www.speeddate.com is attached as Exhibit D. SpeedDate collects its members' data including accessing pre-existing data associated with its users from the users' Facebook accounts, stores member responses to questions regarding "Who I'd Like to Meet," processes the stored member data using compatibility criteria, sorts and matches members, and notifies members of other members SpeedDate has determined to be compatible with them. (Ex. D, '977 Patent Claim Chart).

## IV.    APPLICABLE LEGAL STANDARDS

Claims are to be interpreted in view of the intrinsic evidence – namely the claims

themselves, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*). The analytical focus of claim construction must begin with and remain centered on the language of the claims themselves. *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). There is a heavy presumption that a claim term carries its ordinary and customary meaning to persons of skill in the art at the time of the invention. *3M Innovative Prop. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1370 (Fed. Cir. 2003). Sometimes the ordinary meaning of a claim term is readily apparent, in which case claim construction involves "little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*). Indeed, some claim terms are so simplistic that no further construction is required at all. *W.E. Hall Co., Inc. v. Atlanta Corrugating, LLC*, 370 F.3d 1343, 1350 (Fed. Cir. 2004). The context of surrounding words in the claim should also be considered in determining the ordinary and customary meaning of a disputed claim term. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 345 F.3d 1318, 1325 (Fed. Cir. 2003).

The claims themselves do not stand alone, but rather are part of a "fully integrated written instrument." *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the claims "must be read in view of the specification, of which they are a part." *Id.* The specification is thus "the primary basis for construing the claims" and has been described as "the single best guide to the meaning of a disputed term." *Id.* The Court should never lose sight that while claims must be construed in light of the specification, limitations from the preferred embodiments or specific examples in the specification

cannot be read into the claims. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1370 (Fed. Cir. 2008) ("[T]his court will not at any time import limitations from the specification into the claims."); *Laryngeal Mask Co. Ltd. v. Ambu A/S*, 618 F.3d 1367 (Fed. Cir. 2010). The Federal Circuit has explained the reasoning behind this:

> If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims. Nor could an applicant, regardless of the prior art, claim more broadly than that embodiment … It is the claims that measure the invention.

*SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985). Thus, while the specification may be used to aid in the interpretation of the claims, it may not be used as a source for adding extraneous limitations, even when a patent discloses only a single embodiment in the specification. *Laryngeal Mask Co. Ltd.*, 618 F.3d 1367; *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1366 (Fed. Cir. 2004). The examples described and illustrated in the specification are intended to be just that – examples, not claim limitations. *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010). As the Federal Circuit has long held: "Specifications teach. Claims claim." *Rexnord Corp. v. Laitram*, 274 F.3d 1336, 1344 (Fed. Cir. 2001).

Doing so would be contrary to long-established precedent of the Federal Circuit, which has repeatedly held "that the fact that the specification describes only a single embodiment, standing alone, is insufficient to limit otherwise broad claim language." *Howmedica Osteonics Corp. v. Wright Medical Tech., Inc.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008); *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir.

2008) ("this court will not countenance the importation of claim limitations from a few specification statements or figures into the claims"); *Phillips*, 415 F.3d at 1323 ("we have repeatedly warned against confining the claims to those ['very specific'] embodiments"). That follows from the principle that an inventor need not include all the features of his invention in every claim. *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004) ("The patentees were not required to include within each of their claims all of these advantages or features described as significant or important in the written description. … An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them….") (citations omitted).

In addition to consulting the specification, the Court should also consider the patent's prosecution history. *Phillips*, 415 F.3d at 1317 ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention."). While the prosecution history may alter the plain meaning of claim language through the doctrine of prosecution history disclaimer, for such disclaimer to attach, the Court must find "disavowing actions or statements made during prosecution [which are] both clear and unmistakable." *Omega Eng'g, Inc. v. Raytek, Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003). Thus, disclaimer must be express, and not one that arises through mere inference. *SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1306 (Fed. Cir. 2003).

The intrinsic record, comprising the claims, the specification, and the prosecution history, must be examined in every case to determine whether the presumption of

ordinary and customary meaning of a disputed claim term is rebutted. *Arlington*, 345 F.3d at 1325-26. The Court may also rely upon extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises. *Phillips*, 415 F.3d at 1317. The Court is not prohibited from examining extrinsic evidence, even when the patent document itself is clear. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999). However, extrinsic evidence, including expert testimony, may not be used to vary or contradict the otherwise unambiguous meaning of a claim term, *Desper Prods., Inc. v. QSound Labs*, 157 F.3d 1325, 1333 (Fed. Cir. 1998), and is less significant than intrinsic evidence in determining the proper claim construction. *Phillips*, 415 F.3d at 1317.

## V. JEDI'S PROPOSED CLAIM CONSTRUCTIONS

### A. '098 Patent, Claim 4, "automated display of human participant-specific data" and "automatically displaying at least a portion of the sorted human participant specific data to at least one participant"

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| automated display of human participant-specific data | Preamble is not a limitation. If the Court determines a construction is necessary, Jedi proposes:<br><br>Automated display of data specific to individual network participants | visual presentation of data associated with a user on a screen, wherein such depiction occurs without user intervention |
| automatically displaying at least a portion of the sorted human participant specific data to at least one participant | Providing at least a portion of the sorted data specific to individual network participants to at least one participant without requiring the participant to click on the profiles of every participant to determine compatibility | visually presenting on a screen at least a part of at least one other user's data to a first user, wherein such presentation occurs without user intervention |

Jedi addresses the above-identified claim phrases together given their overlap in language, but notes that the first phrase appears only in the preamble of the claim. "In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality to the claim. … Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *Catalina Mktg. Int'l v. Coolsavings,com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citations omitted). A preamble may be limiting if it provides "antecedent basis" for a later term, "is essential to understand limitations or terms in the claim body," or "when reciting additional structure or steps underscored as important by the specification." *Id.* However, "if it is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim (and was not clearly added to overcome a rejection), we do not construe it to be a separate limitation." *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1288-1289 (Fed. Cir. 2008).

Jedi contends that the preamble of claim 4 of the '098 Patent is not limiting and should not be construed separately. In particular, Jedi notes that the preamble is merely duplicative of the second phrase identified above, which appears in the last step in the body of the claim, and accordingly should not be construed as a separate limitation. *Symantec Corp.*, 522 F.3d at 1288-1289. If the Court determines a construction is necessary, Jedi proposes that "automated display of human participant-specific data" be construed to mean "automated display of data specific to individual network participants." Jedi's proposal essentially reorders the language of the phrase to clarify the

meaning of "participant-specific"—that is, that the participants are "network participants" and that "participant-specific" data means data specific to individual participants.

For the actual claim limitation, Jedi proposes a more substantive construction, which is directed at clarifying that "automatically" displaying data in the context of this claim means that the sorted data is sent *without requiring the participant to click on the profiles of every participant to determine compatibility*. This proposal most naturally aligns with the '098 Patent's written description, including the problem to be solved:

> It is impossible for a user to view every profile of the other chatters (via a link to a profile display) who were logged into the Chat Room system at that given time; people log in and out of the system randomly. More specifically, the IDPP may be employed to notify a user of other chatters' characteristics *without having to click on links to find other chatters'* profile information. If the IDPP's system logic determines that two or more people are compatible (using Compatibility Criteria), the profile information for the compatible chatter(s) may be automatically displayed. This saves chatters time by *not requiring them to click on the profiles of every chatter within the system to determine the compatibility* of said chatters.

(Ex. A, '098 Patent, Col. 10:38-50). Thus, Jedi's proposal should be adopted.

Defendant's proposals for these phrases are substantively the same, and have at least two problems. First, Defendant's litigation-inspired attempt to import "visually displaying on a screen" into the "displaying" step is inappropriately, and entirely, tied to the forthcoming infringement analysis. Specifically, Defendant would like to twist and force Claim 4 into a "joint infringement" situation between itself and the end users of its website in order to provide another burden for Jedi to prove at trial—that Defendant controls steps carried out by end users. *See BMC Res., Inc. v. Paymentech, L.P., 498 F.3d 1373, 1380-81 (Fed. Cir. 2007).* Additionally, importing the term "screen," for

instance, adds hardware not expressly required by the claim language.  In stark contrast, Jedi's proposal merely substitutes the term "providing" for "displaying," consistent with the specification of the '098 Patent, which uses those terms interchangeably.  (Ex. A, '098 Patent, Col. 3:62-64) ("Many chat Room systems use a database to ***provide or display*** a list of characteristics of one chatter to another chatter.") (emphasis added).

Second, Defendant's proposals also require that "automatically displaying" data means that it "occurs without user intervention."  Squint as it may, Jedi was unable to find support for this overbroad interpretation of "automatically" in the intrinsic record. As set forth with respect to Jedi's proposal, "automatically" providing sorted data in the context of this claim merely means that a participant need not click through all the profiles to find a match—not that the system works ***wholly*** "without user intervention."

**B.    '098 Patent, Claim 4, "real-time network"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Preamble is not a limitation.  If the Court determines a construction is necessary, Jedi proposes:<br><br>Computer network allowing for immediate communication | a network that simulates a live experience |

Importantly, the term "real-time network" appears only in the preamble of Claim 4. (Ex. A, '098 Patent, Ex Parte Reexam Cert, Col. 1:32 – Col. 2:11).  Jedi contends that the preamble of claim 4 of the '098 Patent is not limiting and should not be construed separately.  Specifically, the term "real-time network" is used in the preamble only to state a purpose or intended use for the invention.  In contrast, the written description

provides that at least one embodiment includes "Chat room software that enables human participants to communicate in real-time via the network protocol such as iChat™ or IRCD." (Ex. A, '098 Patent, Col. 12:42-45). In that embodiment, the "real-time" component is important because actual chatting among participants takes place. However, actual chatting among network participants is not a required step of claim 4, and accordingly, the "real-time network" term in the preamble is not "essential to understand limitations or terms in the claim body." *Catalina Mktg. Int'l*, 289 F.3d at 808. Accordingly, this preamble term is not limiting and should not be construed separately.

Nevertheless, if the Court determines that construction of this preamble term is necessary, Jedi proposes that "real-time network" should be construed to mean "computer network allowing for immediate communication." This proposal is consistent with the chat room systems described in the specification that include "communication via typing on a keyboard or via voice chat," as well as the typing chat shown in Figure 2. (Ex. A, '098 Patent, Figure 2, Col. 3:35-36). The Court may also rely upon extrinsic evidence, such as dictionary definitions. *Phillips*, 415 F.3d at 1317. Jedi's proposed construction is consistent with the dictionary definitions of network ("A communications, data exchange, and resource sharing system created by linking two or more computers…") and real time ("The immediate processing of input…"). (Ex. E, WEBSTER'S NEW WORLD DICTIONARY OF COMPUTER TERMS 369-370, 455 (8th ed. 2000)).

Defendant's proposed construction that a "real-time network" is "a network that simulates a live experience" is unsupported in the intrinsic record and, in fact, is at odds with the citations to the '098 Patent cited above. Indeed, the word "live" appears

nowhere in the '098 Patent. Importing the requirement that a real-time network simulate a "live experience," as Defendant proposes, suggests that chatting by typing on a keyboard is excluded because such communication does not necessarily simulate "live" conversation—i.e. conversation while sitting across the table from someone.

### C. '098 Patent, Claim 4, "collecting human participant specific data"; and '977 Patent, Claim 1, "collecting user specific data and preferences"

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| collecting human participant specific data | Plain and ordinary meaning. If the Court determines a construction is necessary, Jedi proposes:<br><br>Collecting data specific to individual network participants | retrieving data about a user |
| collecting user specific data and preferences | Plain and ordinary meaning. If the Court determines a construction is necessary, Jedi proposes:<br><br>Collecting data and preferences specific to individual network participants | retrieving data about a user and information regarding qualities a user desires in a match |

Jedi addresses these claim phrases together given their overlap in language. Jedi contends that these claim limitations should be given their plain and ordinary meaning, and that no further construction is required. As numerous courts in the District of Arizona have found, terms that are clear on their face and include commonly understood words do not need to be construed. *See Synthes USA, LLC v. Diverse Surgical Supplies, Inc.*, 2011 U.S. Dist. LEXIS 14074, at *27 (D. Ariz. Jan. 21, 2011) ("Terms C and D do not warrant construction as they are plain on their face and the proposed constructions do not provide clarity."); *TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*, 2011 U.S. Dist.

LEXIS 5640, at *56 (D. Ariz. Jan. 12, 2011) ("The claim term 'the other layer' is clear on its face and does not need to be construed by the Court."); *GolfSwitch Inc. v. TeeConnect, LLC*, 2008 U.S. Dist. LEXIS 111252, at *32 (D. Ariz. Aug. 1, 2008) ("[T]he court concludes 'transaction' is a commonly understood word and need not be construed."). If the Court determines a construction is necessary, Jedi's proposals merely reorder and restate the claim to clarify the meanings of "participant-specific" and "user specific"— that the participants or users are both "network participants" and that "participant-specific" or "user specific" data simply means data specific to individual participants.

Defendant's constructions inappropriately substitute the term "retrieving" for "collecting." As the Federal Circuit has recognized, "when an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms." *Innova/Pure Water v. Safari Water Filtration*, 381 F.3d 1111, 1119 (Fed. Cir. 2004). This inference is dispositive unless the context makes clear that the different words express the same concept. *Id.* at 1119-1120. Importantly, claim 4 of the '098 Patent includes both steps of "***collecting*** human participant specific data" and "***retrieving*** at least one compatibility criteria." (Ex. A, '098 Patent, Ex Parte Reexam Cert, Col. 1:35-36 and Col. 1:54-55) (emphasis added). Accordingly, the inference attaches that the patentee intended his choice of different terms to reflect a differentiation in the meaning of those terms.

The context of the claim language and written description make clear that the patentee intended the words "collecting" and "retrieving" to express different concepts. Turning first to the claim itself, it is clear that "collecting … data" pertains to the initial

gathering of information before it is stored in the database, including "presenting to the human participant an on-line survey comprising a plurality of questions." *Id.* at Col. 1:35-50. In contrast, the "retrieving at least one compatibility criteria" limitation does not pertain to any initial collection of data, but instead, appears in the step of "processing the stored human participant specific data." *Id.* at Col. 1:50-62. This is consistent with the patentee's use of the terms "collect" and "retrieve" in the patent's written description. *See* (Ex. A, '098 Patent, Col. 12:48-49) ("[V]arious means may be employed to accomplish the data ***collection***, including but not limited to: Human participant entry of data directly into the database."); *Id.* at Col. 11:14-18 ("***retrieve*** profile and compatibility metrics from a database") (emphasis added). Therefore, according to the inventor, one collects data ***into*** a database, but retrieves data ***from*** a database. Thus, Defendant's substitution of "retrieving" for "collecting" is amiss.

Defendant's substitution of "qualities a user desires in a match" for "preferences" is also unsupported and at odds with the intrinsic record. The term "qualities" appears nowhere in the '098 Patent, and is not an equivalent of "preferences." As the specification makes clear, "Data required for comparison may be as simple as marital status (e.g., single and divorced chatters being identified as compatible), need for employment, religious preferences, or age." (Ex. A, '098 Patent, Col. 6:49-52). Marital status and age are not "qualities" of a person—courteous and dependable are "qualities." Rather, in the context of the '098 Patent, a network participant may have "preferences" for meeting people of a particular marital status and age. Accordingly, Defendant's substitution of "qualities" for "preferences" is misguided.

### D. '098 Patent, Claim 4, "presenting to the human participant an on-line survey"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning | causing an on-line survey to be visually depicted on a screen to a user |

Jedi contends that the present limitation should be given its plain and ordinary meaning, and that it needs no further construction. Jedi's proposal is consistent with the general principles of claim construction under which the words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips*, 415 F.3d at 1312-1313. Where the meaning is clear from the plain language of the claim, no further construction is necessary. *Synthes USA, LLC*, 2011 U.S. Dist. LEXIS 14074, at *27; *TriQuint Semiconductor, Inc.*, 2011 U.S. Dist. LEXIS 5640, at *56; *GolfSwitch Inc.*, 2008 U.S. Dist. LEXIS 111252, at *32. On its face, this limitation is clear and includes only words that are commonly understood. There is no reason to depart from that meaning.

Defendant merely repeats its inappropriate and litigation-inspired attempt to import "visually depicted on a screen" into the claim, as it did for the "automatically displaying" elements discussed above. Here again, Defendant endeavors to provoke a "joint infringement" situation between itself and its customers where none exists, s*ee BMC Res., Inc.*, 498 F.3d at 1380-81, and import the term "screen" to add hardware not expressly required by the claim language. Such importation is improper. *Innogenetics, N.V.*, 512 F.3d at 1370 ("[T]his court will not at any time import limitations...").

### E. '098 Patent, Claim 4, "processing the stored human participant specific data, using the compatibility criteria"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Processing the stored data specific to individual network participants, using the criteria for determining that two or more people are compatible | using predetermined metrics to compare multiple users' data |

Jedi's proposal for the present limitation comports with the intrinsic record, while Defendant's proposal violates a fundamental canon of claim construction—not to import limitations. First, Jedi's proposal is directed at clarifying the terms "participant specific data" and "compatibility criteria" found in this limitation. As to "participant specific data," Jedi's proposal incorporates the same changes it proposes for the other limitations, *supra*, in which this term appears—which is to essentially reorder and restate the language of the phrase to clarify that the participants are "network participants" and that "participant-specific" data simply means data specific to individual participants.

With respect to "compatibility criteria," Jedi proposes "criteria for determining that two or more people are compatible," as that term is consistently referred to in the '098 Patent. Specifically, the written description states:

> If the IDPP's system logic ***determines that two or more people are compatible (using Compatibility Criteria)***, the profile information may be automatically displayed.
> ***
> If the IDPP's system logic ***determines that two or more people are compatible (using Compatibility Criteria)***, the profile information for the compatible chatter(s) may be automatically displayed.

(Ex. A, '098 Patent, Col. 6:16-18 and Col. 10:44-47). As these excerpts make clear, compatibility criteria is simply criteria for determining that two or more people are

compatible, as Jedi's proposal properly conveys.

Defendant's proposal imports limitations, ignores the surrounding claim language, and substitutes incongruous language for claim terms. First, Defendant's proposal inappropriately reads the limitation "predetermined" into the claim from other claims. As the Federal Circuit has repeatedly recognized, ""[d]ifferences among claims can . . . be a useful guide in understanding the meaning of particular claim terms." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) (citing *Phillips*, 415 F.3d at 1314, and finding that "[t]he asserted claims, in contrast to other claims in these patents, do not contain a [specific limitation], and we decline to read such a limitation into them"). Here, Claim 6 of the '098 Patent is expressly directed at "the automated notification of compatible participants based upon *predetermined* criteria." (Ex. A, '098 Patent, Ex Parte Reexam Cert, Col. 2:13-15) (emphasis added). Claim 4, on the other hand, includes no such express requirement, and it should not be read in.

Defendant's addition of "to compare multiple users' data" is superfluous and ignores the rest of this limitation, thus disregarding that the surrounding words in the claim should also be considered in determining the meaning of a disputed claim term. *Arlington Indus., Inc.*, 345 F.3d at 1325. In particular, the "processing" method step expressly includes "retrieving … at least one characteristic and a threshold," and "applying the compatibility criteria to a plurality of records." Accordingly, the claim language itself describes what the "processing" step includes, and Defendant's addition of "to compare multiple's users' data" is neither accurate nor necessary.

Lastly, Defendant improperly substitutes the more scientific term "metric" for

"criteria."   The term "criteria" itself is commonly understood and needs no further construction.  Indeed, the inventor used that word repeatedly and consistently throughout the specification and claims—over twenty-five times.  The more scientific term "metric" only appears once in one specific embodiment where a program is run to "calculate" compatibility including a "score."  (Ex. A, '098 Patent, Col. 11:13-24).  As set forth more fully regarding the next disputed term, "compatibility criteria," neither claim 4 of the '098 Patent nor Claim 1 of the '977 Patent expressly require that a "score" be calculated, and that limitation should not be read into these claims.

### F.    '098 Patent Claim 4, '977 Patent Claim 1, "compatibility criteria"

| Plaintiff's Construction | Defendant's Construction |
| --- | --- |
| Criteria for determining that two or more people are compatible | predetermined metrics used to determine a compatibility score between and among two users |

As set forth in the previous subsection, Jedi construes "compatibility criteria" to mean "criteria for determining that two or more people are compatible," which is consistent with the specification of the '098 Patent.  Again, the written description states:

> If the IDPP's system logic *determines that two or more people are compatible (using Compatibility Criteria)*, the profile information may be automatically displayed.
> ***
> If the IDPP's system logic *determines that two or more people are compatible (using Compatibility Criteria)*, the profile information for the compatible chatter(s) may be automatically displayed.

(Ex. A, '098 Patent, Col. 6:16-18 and Col. 10:44-47).  Accordingly, Jedi's construction clearly aligns with the specification, which has been described as "the single best guide to the meaning of a disputed term."  *Phillips*, 415 F.3d at 1315.

In contrast, Defendant's construction inappropriately reads the term "score" into these claims, thus violating the canon of claim construction against importing limitations. *Innogenetics, N.V.*, 512 F.3d at 1370 ("[T]his court will not at any time import limitations ..."). Doing so would be contrary to long-established precedent finding that even where "the specification describes only a single embodiment, standing alone, is insufficient to limit otherwise broad claim language." *Howmedica Osteonics Corp.*, 540 F.3d at 1346; *Computer Docking Station Corp.*, 519 F.3d at 1374 ("this court will not countenance the importation of claim limitations from a few specification statements or figures into the claims"). An inventor need not include all the features of his invention in every claim. *Golight, Inc.*, 355 F.3d at 1331-32.

Here, the specification describes embodiments that include determining compatibility both *with and without* calculating a "score", stating:

> In the examples presented to this point, the ***threshold for compatibility has been a "match"*** (e.g., equals or opposites). However, it will also be appreciated that in various rankings, or combinations of compatibility criteria, ***a score or point system may be used***, where compatibility is determined based upon the difference in points or score being within a predefined threshold. ***These are only two examples*** of ways to determine and identify data of a chatter needed to compare with data of other chatters. Data required for comparison may be as simple as marital status (e.g., single and divorced chatters being identified as compatible), religious preferences, or age.

(Ex. A, '098 Patent, Col. 11:56-67) (emphasis added). The specification expressly makes clear that the exemplary "score" method for compatibility is intended to be just that—an example—and not a necessary claim limitation. Notably, the specification says a score or point system "may be" used. "May be" is different than "must be." Moreover, requiring

that a "score" be calculated would exclude the last example from the excerpt above in which the compatibility criteria is as simple as marital status, religion or age. Lastly, as discussed more fully above, Defendant's construction also inappropriately reads the limitation "predetermined" into the claim from other claims, and unfittingly substitutes the more scientific term "metric" for "criteria." These changes are simply unsupported.

### G. '098 Patent, Claim 4, "to determine interpersonal compatibility between at least two network participants"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| To determine the compatibility between two or more people who are network participants | to determine how well two users would be able to exist, live together, or work successfully with each other |

Jedi's proposal for the present limitation largely restates the claim language, merely clarifying that "interpersonal compatibility" means "compatibility between two or more people." This construction is designed to reinforce that the claimed invention is directed at matching "people," and not merely for the automated display of data. This is consistent with statements made in the specification, such as "[i]f the IDPP's system logic *determines that two or more people are compatible (using Compatibility Criteria)*, the profile information may be automatically displayed." (Ex. A, '098 Patent, Col. 6:16-18); *Id.* at Col. 5:16-17 ("interpersonal relationships are most successful when the people involved have much in common"). The Court may also rely upon extrinsic evidence, such as dictionary definitions. *Phillips*, 415 F.3d at 1317. Jedi's proposed construction is supported by the dictionary definition of "interpersonal," which has been defined to mean "[o]f, pertaining to, involving, or being relations between persons." (Ex. F, WEBSTER'S II NEW COLLEGE DICTIONARY 579 (2001)).

1    Defendant's proposal improperly attempts to provide a list of why compatibility is

2    sought—i.e. for "to exist, live together, or work successfully with each other."  Notably,

3    Defendant's list includes the closed-ended term "or" and therefore may exclude

4    compatibility sought for other purposes, such as friendship, dating, hobbies, etc.  The

5    relevant case law teaches against including such lists of examples.  For instance, the

6    Northern District of California refused to include such exemplary language, stating:

7        By including such a list, a jury could mistakenly interpret the scope of the
         term to be narrower than intended by: (1) finding the list of examples to be
8        exhaustive; or (2) finding that the term is somehow limited to a subset of
         the items on the list. … Accordingly, the Court finds that Defendants'
9        proposed exemplary language is superfluous.

10   *Keithley v. The Homestore.com, Inc.*, 2007 U.S. Dist. LEXIS 71126 at *23-24 (N.D. Cal.

11   Sept. 10, 2007); *See also General Electric Co. v. Sonosite, Inc.*, 580 F. Supp. 2d 743, 758

12   (W.D. Wis. 2008) ("including this list of examples into the claim language is of little

13   value").  Indeed, even the Manual of Patent Examining Procedure instructs against the

14   use of examples in the claims.  "Description of examples or preferences is properly set

15   forth in the specification rather than the claims."  (MPEP 2173.05(d)).  Accordingly,

16   examples do not belong in claim language, and should not be read into the claim.

17        **H.**    **'098 Patent Claim 4, '977 Patent Claim 1, "compatibility criteria
          [that] includes at least one characteristic and a threshold"**
18

| Plaintiff's Construction | Defendant's Construction |
| --- | --- |
| criteria for determining that two or more people are compatible [that] includes one or more characteristics of a person and a threshold for matching people | predetermined metrics used to determine a compatibility score for two users [that] include (1) at least one facet that can be used to determine "compatibility" between two users; and (2) a threshold "compatibility" score, above which a match is determined to exist between two users and below which a match is not determined to exist |

Jedi's proposal for the present limitation merely incorporates its construction of "compatibility criteria" and, further, clarifies that "at least one characteristic and a threshold" means "one or more characteristics of a person and a threshold for matching people." See Section V-F, *infra*, regarding Jedi's support for "compatibility criteria." Jedi's construction is also designed to again reinforce that the claimed invention is directed at matching "people," and not merely for the automated display of data.

The parties' dispute, however, is primarily focused on the "characteristic" and "threshold" terms. With respect to these terms, Jedi's construction aligns with the written description (without importing any limitations), which states:

> In the examples presented to this point, the ***threshold for compatibility has been a "match"*** (e.g., equals or opposites). However, it will also be appreciated that in various rankings, or combinations of compatibility criteria, ***a score or point system may be used, where compatibility is determined based upon the difference in points or score being within a predefined threshold***. These are only two examples of ways to determine and identify data of a chatter needed to compare with data of other chatters. Data required for comparison may be as simple as marital status (e.g., single and divorced chatters being identified as compatible), religious preferences, or age.

(Ex. A, '098 Patent, Col. 11:56-67). Specifically, Jedi's construction merely clarifies the "threshold" as a "threshold for matching people," appropriately allowing it to cover either the "'match' (e.g., equals or opposites)" threshold or the "score or point system" threshold disclosed in the specification. Defendant's construction, which imports a "compatibility score," excludes the embodiment of a "'match' (e.g., equals or opposites)" type threshold. Multiple embodiments are clearly disclosed, and as the Federal Circuit has repeatedly held, even where "the specification describes only a single embodiment,

standing alone, is insufficient to limit otherwise broad claim language." *See Howmedica Osteonics Corp. v.*, 540 F.3d at 1346. The intrinsic record simply does not support that claim 4 of the '098 Patent or Claim 1 of the '977 Patent (both at issue for this limitation) are limited to the "score or point system" embodiment. Jedi's proposed construction, on the other hand, allows for both "match" and "score" thresholds which, based on the language in the claims and in the specification, is the intent of the inventor.

### I. '098 Patent, Claim 4, "applying the compatibility criteria to a plurality of records"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Applying to a plurality of records the criteria for determining that two or more people are compatible | using predetermined metrics to generate compatibility scores between two users |

Jedi's construction of the present limitation merely incorporates its construction of "compatibility criteria"—i.e. "criteria for determining that two or more people are compatible." Aside from this change, Jedi's proposal merely reorders the words, which are clear on their face, are commonly understood and do not need to be construed.

Defendant's construction inappropriately imports the limitations "predetermined" (*see* Section V-E, *infra*) and "compatibility score" (*see* Sections V-F and V-H, *infra*), and substitutes the more scientific term "metric" for "criteria" (*see* Section V-E, *infra*). As indicated, Jedi's objections to these terms parallel that discussed above, and accordingly, the same shortcomings which doom Defendant's proposed constructions above are equally applicable here. Additionally, Defendant's construction glosses over the claim language "to a plurality of records," disregarding that "[c]laims must be 'interpreted with an eye toward giving effect to all terms in the claim.'" *Becton, Dickinson & Co. v. Tyco*

1  *Healthcare Group, LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010) (quoting *Bicon, Inc. v.*

2  *Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006).  Defendant ignores the phrase "to a

3  plurality of records," and consequently, improperly reads that limitation out of the claim.

4      **J.      '098 Patent, Claim 4, "wherein the participant specific data**
        **includes a chat time a first participant is available to chat"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Wherein the data specific to individual network participants includes a chat time a first participant is available to chat | wherein the data associated with a first user includes a specific time designated by the first user that the first user will be available to communicate in real-time online |

        Jedi's proposal stays true to the language of the claim, and is directed at clarifying

the term "participant specific data."  Specifically, Jedi's proposal incorporates the same

changes it proposes for other limitations, *supra*, in which this term appears—which is to

essentially reorder and restate the language of the phrase to clarify that the participants

are "network participants" and that "participant-specific" data simply means data specific

to individual participants.   The remaining terms of this limitation, specifically "a chat

time a first participant is available to chat," however, are clear on their face, include

commonly understood words and do not need to be construed.   Not to be lost in this

analysis is the fact that this phrase appears in step (e), the "automatically displaying" and

"notifying" step, of Claim 4.  The inventor described this step in the specification:

> [U]sers of a chat room system may be paged, notifying a user that another
> person that he/she should be introduced to is either in the chat room, or ***is***
> ***on-line and available to go to the chat room*** in order to converse.

(Ex. A, '098 Patent, Col. 12:64-67).  Jedi's proposal gives the broad claim language the

scope it deserves in view of these statements.  In particular, the claimed "chat time" can

merely mean that the participant is "on-line and available to go to the chat room."

Defendant's construction limits the scope of "chat time," importing the limitations "specific time" and "designated by the first user." As a threshold matter, the words "specific time" appear nowhere in the '098 Patent. More importantly, they do not provide clarity to this limitation, but instead, introduce uncertainty. What is a "specific time"? 7:15 A.M. CST? One hour from now? Neither the plain language of the claims nor the specification support Defendant's proposed "specific time" language. Defendant's "designated by the first user" language ignores that the Federal Circuit "will not countenance the importation of claim limitations from a few specification statements or figures into the claims." *Computer Docking Station Corp.*, 519 F.3d at 1374. As noted above, a user may merely be notified that another person is on-line at that time and available—no requirement is stated that chat time is "designated by the first user."

### K. '098 Patent, Claim 4, "to solicit an auto-response indicating whether the compatible participant wishes to chat with said first participant during the time indicated as available to chat"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| To allow a compatible network participant to make a selection indicating whether he/she wishes to chat with the other person during the time indicated as available to chat | to seek a selection by a second user, determined to be compatible with the first user, as to whether or not the second user wishes to communicate in real-time online with the first user at the specific time designated by the first user, and wherein upon making such selection a response is sent without further user intervention |

Jedi's proposal aligns with the intrinsic record, including both the specification and the prosecution history, whereas Defendant's (verbose and elaborate) proposed construction improperly imports multiple limitations.

Jedi's proposal mimics the language used in the specification and noted by the USTPO examiner in allowing claim 4 of the '098 patent during the reexamination:

> Examiner notes that the '098 Patent describes an "auto-response" as follows: "If compatible, then the chat room system e-mails them both each other's profile info (step 224) and ***allows them to make an auto-response selection showing whether or not they wish to chat with the other person***, and at what time they will log into the system (whether it's immediately or 5, 10, 15 minutes etc.) If they both confirm that they want to chat, then the system may also e-mail them both a confirmation with the time that they both agree to meet in the system." (the '098 Patent, Col. 13, II. 39-46)

(Ex. G, Reexam Control No. 90/010,360, Dec. 2, 2010 Notice of Intent to Issue Ex Parte Reexamination Cert., pp. 6-7) (emphasis added). Significantly, Jedi's proposal conveys that this step merely "allow[s]" a response by the participant, and not that "a response is sent" as proposed by Defendant.

Defendant's proposed construction improperly imports the limitations "specific time designated by the first user" and "wherein upon making such selection a response is sent without further user intervention." With respect to the former, the "specific time" requirement is unsupported by the specification and merely introduces ambiguity, as set forth in Section V-K, *supra*. With the "designated by the first user" requirement, Defendant's construction improperly imports limitations, clearly focusing on only certain statements in the specification, while ignoring others. Additionally, Defendant's construction seeks to add an entirely new step to the method, requiring that "upon making such selection a response is sent without further user intervention." Neither the plain language of the claim, nor part of the specification which was relied upon by the examiner in allowing this claim, require that "a response is sent." Defendant's addition

of this step appears to be solely inspired by its desire to force Claim 4 into a "joint infringement" situation, as discussed more fully in Sections V-A and V-D, *supra*, *see BMC Res., Inc.*, 498 F.3d at 1380-81, and should therefore be rejected.

**L.     '098 Patent, Claim 7, "personality trait derived from data provided by the user"; '098 Patent, Claim 8, "psychological personality trait"**

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| personality trait derived from data provided by the user | Plain and ordinary meaning | a facet of a user's personality calculated by the system from data provided by a user using predetermined metrics |
| psychological personality trait | Plain and ordinary meaning | a facet of a user's personality relating to psychology |

Jedi contends that these claim limitations need no further construction as they are plain on their face and include only commonly understood words.  As discussed above, *see e.g.* Sections V-C and V-D, both the Federal Circuit and courts in this District agree that the meaning of some claim terms is readily apparent, requiring no further construction.  *W.E. Hall Co., Inc.*, 370 F.3d at 1350 (Fed. Cir. 2004); *Synthes USA, LLC*, 2011 U.S. Dist. LEXIS 14074, at *27.  Defendant seeks to replace the claim terms with less commonly understood words like "facet" and "metric," which do not provide clarity.

Jedi's proposal is consistent with the general principles of claim construction under which the words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art.  *Phillips*, 415 F.3d at 1312-13.  Indeed, the inventor used essentially the same language—"personality trait derived by data" and "psychological personal trait"—in the written description:

> The methods used may also be based upon identified commonality between chatters' ***personality traits*** and geographic location. ***Commonality includes***

*that of psychological personality traits*; such as the way chatters interact emotionally or the way chatters cognitively function.
***
Another example would be where, *as a result of data derived from a test*, a person is labeled as one who tends to voice her emotions whenever they arise. She essentially wears her heart on her sleeve. *Because of this trait, she should be matched with another person that has traits* that allow him the patience to invariably listen to her at the pace in which she voices her emotions.

(Ex. A, '098 Patent, Col. 10:52-57 and Col. 11:3-9). The inventor's use of the language "personality traits," "psychological personality traits" and "data derived from a test" consistently in both the specification and claims supports that further construction is neither appropriate nor necessary.

Defendant's proposed constructions improperly import the limitation "predetermined," and replace the claim terms "trait" and "data" with the less commonly understood terms "facet" and "metrics," respectively. As with the limitation discussed in Section V-E, *supra*, Defendant's proposal inappropriately reads the limitation "predetermined" into the claim from other claims and the specification. *See Kara Tech. Inc.*, 582 F.3d at 1348 (Fed. Cir. 2009) (finding that "[t]he asserted claims, in contrast to other claims in these patents, do not contain a [specific limitation], and we decline to read such a limitation into them"). Claim 6 of the '098 Patent is expressly directed at a method "for the automated notification of compatible participants based upon *predetermined* criteria." (Ex. A, '098 Patent, Ex Parte Reexam Cert, Col. 2:13-15) (emphasis added). However, Claim 7 and Claim 4 on which it depends include no such requirement. Moreover, the excerpt cited above regarding "data derived from a test" does not require—or even suggest—that any "predetermined" element is required. That

excerpt likewise fails to support Defendant's proposal to introduce the more scientific term "metric" into the claim to replace the claim term "data." The term "criteria" itself is commonly understood and needs no further construction. Defendant's replacement of the claim term "trait" with "facet" is similarly unhelpful, and likewise fails to find support in the excerpts cited above.

### M.　'977 Patent, Claim 1, "automatically prompting"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Preamble is not a limitation. If the Court determines a construction is necessary, Jedi proposes:<br><br>Notifying, without requiring users to click on the profiles of every participant to determine compatibility, | prompting [compatible users] without user intervention |

Jedi notes that the present term appears both in the preamble and in the body of Claim 1 of the '977. Accordingly, it should not be construed as a separate limitation in the preamble. *Symantec Corp.*, 522 F.3d at 1288-1289 (stating that "if it is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim (and was not clearly added to overcome a rejection), we do not construe it to be a separate limitation").

With respect to the term "automatically prompting" as it appears in the body of Claim 1 of the '977 Patent, Jedi contends that the term is clear on its face and should be given its plain and ordinary meaning as understood by a person of ordinary skill in the art, who "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1312-1313. If the Court determines a construction is

necessary, Jedi proposes "notifying, without requiring users to click on the profiles of every participant to determine compatibility," which is directed at clarifying that "automatically" prompting in the context of this claim (just like "automatically" displaying in Section V-A, *supra*) means that the prompting is done without requiring the participant to click through the profiles of every participant to find a compatible person. This proposal most naturally aligns with the written description:

> ***This novel prompting or paging process*** is further intended to solve the problem of overcrowded Chat Room systems. … It is impossible for a user to view every profile of the other chatters (via a link to a profile display) who were logged into the Chat Room system at that given time; people log in and out of the system randomly. More specifically, the IDPP may be employed to notify a user of other chatters' characteristics ***without having to click on links to find other chatters'*** profile information. If the IDPP's system logic determines that two or more people are compatible (using Compatibility Criteria), the profile information for the compatible chatter(s) may be automatically displayed. This saves chatters time by ***not requiring them to click on the profiles of every chatter within the system to determine the compatibility*** of said chatters.

(Ex. B, '977 Patent, Col. 10:37-53)[1] (emphasis added).

As with the "automatically displaying" element, Defendant's proposes that "automatically prompting" means that it occurs "without user intervention." As the excerpt from the specification makes clear, "automatically" in the context of this claim merely means that a participant need not click through hundreds or thousands of profiles to find a match—not that the system works ***wholly*** "without user intervention."

---

[1] Attached for general reference is the '977 Patent's Notice of Allowance. (Ex. H)

**N.** **'977 Patent, Claim 1, "accessing pre-existing data associated with a user"; '977 Patent, Claim 1, "where the pre-existing data is available prior to initiation of collecting data for the user"**

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| accessing pre-existing data associated with a user | Plain and ordinary meaning | obtaining data linked to a user that existed prior to a user providing data to the system |
| where the pre-existing data is available prior to initiation of collecting data for the user | Plain and ordinary meaning | where the pre-existing data is available for use by the system before a user provides any data to the system |

Jedi contends that these claim limitations are clear on their face, include only commonly understood words and, accordingly, need no construction. These phrases should merely be given their ordinary and customary meaning as understood by a person of ordinary skill in the art, who "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification," *Phillips*, 415 F.3d at 1312-1313, which states:

> With respect to the collection of human participant defined, human specific data may, ***various means may be employed to accomplish the data collection, including*** but not limited to:
> Human participant entry of data directly into the database via computer keyboard and a network interface (e.g., web-page or specific knowledge that the participant may have acquired), and
> ***Human specific data imported from, or exchanged with, preexisting database records***, such as physical address, e-mail address, and ethnicity as a matter of public record, which may be input into the database.

(Ex. B, '977 Patent, Col. 12:48-58) (emphasis added). Especially viewed in this context, the language of these claim phrases is clear, and no construction is required.

Defendant's constructions add limitations which are not apparently imported from the specification, but instead, created from thin air. First, Defendant's seek to construe

"data associated with a user" as "data linked to a user." The specification excerpt above includes no such "linking" requirement. The term "linking" has a very specific meaning in the field of computers and computer networks. Indeed, the inventor provided a definition for "link" in the specification, stating that "[a] a 'link' is an Internet Address connector or a pointer, typically in an HTML document…[,]" and used the term link in the specification where he intended to so use it. (Ex. B, '977 Patent, Col. 8:40-44). Significantly, the inventor did not use the term "link" in this limitation, nor in the specification excerpt above, so these claim phrases should not be so limited. Defendant's requirement that the preexisting data be available "for use by the system" before a user provides any data to the system is similarly unsupported. The "preexisting database records" set forth in the specification, such as physical address, e-mail address, and ethnicity, are not necessarily available "for use by the system" before a user provides any data. Thus, Defendant's proposed limitations should not be read into the claim.

**O.    '977 Patent, Claim 1, "and thereby indicating interpersonal compatibility between the users"**

| Plaintiff's Construction | Defendant's Construction |
| --- | --- |
| Plain and ordinary meaning. If the Court determines a construction is necessary, Jedi proposes:<br><br>and thereby indicating compatibility between two or more people between the users | and thereby indicating how well two users would be able to exist, live together, or work successfully with each other |

Jedi contends that the present limitation is plain on its face, includes only commonly understood words and needs no further construction. If the Court determines that a construction is necessary, then Jedi's proposal merely incorporates its construction

of "interpersonal compatibility," meaning "compatibility between two or more people," which it also proposed in Section V-G, *supra*. This is consistent with the specification, which states "[i]f the IDPP's system logic ***determines that two or more people are compatible (using Compatibility Criteria)***, the profile information may be automatically displayed," (Ex. B, '977 Patent, Col. 6:19-21), as well as Jedi's extrinsic evidence defining "interpersonal" to mean "[o]f, pertaining to, involving, or being relations between persons." (Ex. F, Webster's II New College Dictionary 579 (2001)).

Again, Defendant's proposal includes the closed-ended term "or" and therefore may exclude compatibility for other purposes, such as friendship, dating, hobbies, etc. As discussed in Section V-G, *supra*, both the relevant case law and the Manual of Patent Examining Procedure teach against such lists of examples. *Keithley*, 2007 U.S. Dist. LEXIS 71126 at *23-24; MPEP 2173.05(d). Accordingly, Defendant's proposed list of examples should not be read into the claim.

### P.     '977 Patent, Claim 2, "publicly available"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning. If the Court determines a construction is necessary, Jedi proposes: Available to the public | available to the system without any restrictions on access |

Defendant's overuse of the claim construction process (including its insistence on construing twenty-two terms in contrast to Jedi's proposal of two) is perhaps most apparent with respect to the present limitation. Jedi contends that the term "publicly available" is clear on its face, commonly understood and needs no further construction. Importantly, "publicly available" in the context of Claim 2 is being used to describe the

preexisting data. (Ex. B, '977 Patent, Col. 16:12-13). As discussed in Section V-N, *supra*, the specification describes this stating:

> Human specific data imported from, or exchanged with, ***preexisting database records, such as physical address, e-mail address, and ethnicity as a matter of public record***, which may be input into the database.

(Ex. B, '977 Patent, Col. 12:55-58) (emphasis added). This description is consistent with the plain and ordinary meaning of "publicly available," as that term is commonly understood. If the Court determines that a construction is necessary, Jedi simply proposes "available to the public," which is also consistent with the specification.

Defendant's proposed construction requires, without any intrinsic support, that "publically available" means available "to the system" and "without any restrictions on access." The above excerpt provides no support for these extraneous limitations. Notably, Claim 1, on which Claim 2 depends, requires that the "preexisting data is available prior to initiation of collecting data for the user." (Ex. B, '977 Patent, Col. 15:37-39). Thus, under Defendant's proposal, the preexisting data must be "available to the system without any restrictions on access" and "available prior to initiation of collecting data for the user." Matters of public record, which are expressly described in the excerpt above, may not be available ***to the system*** and ***without any restrictions on access***, and further may not be available prior to the collection of basic information for the user, such as the user's name. Defendant's proposal is simply unsupported.

## VI. CONCLUSION

For all of the foregoing reasons, Jedi's proposed constructions are the correct constructions, and Jedi requests that the Court adopt them in their entirety.

Respectfully submitted,

/s/      Brian E. Haan
Sean E. Brearcliffe (State Bar No. 016861)
RUSING LOPEZ & LIZARDI, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona 85718
Tel: (520) 792-4800
Fax: (520) 529-4262
Email: sbrearcliffe@rllaz.com

Raymond P. Niro *(Pro Hac Vice)*
Raymond P. Niro, Jr. *(Pro Hac Vice)*
Brian E. Haan *(Pro Hac Vice)*
Daniel R. Ferri *(Pro Hac Vice)*
NIRO, HALLER & NIRO
181 W. Madison St., Suite 4600
Chicago, Illinois  60602
Tel: (312) 236-0733
Fax: (312) 236-3137
Email: rniro@nshn.com
Email: rnirojr@nshn.com
Email: bhaan@nshn.com
Email: dferri@nshn.com

*Counsel for Jedi Technologies, Inc.*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 17, 2012 the foregoing:

**PLAINTIFF JEDI TECHNOLOGIES, INC.'S OPENING *MARKMAN* BRIEF**

was filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following counsel of record.

Sean D. Garrison (State Bar No. 014436)
LEWIS AND ROCA LLP
40 North Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 262-5311
Facsimile: (602) 262-5747
Email: sgarrison@lrlaw.com

Heidi L. Keefe
COOLEY LLP
5 Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
Telephone: (650) 843-5000
Facsimile: (650) 849-7400
Email: hkeefe@cooley.com

***Counsel For Defendant Speeddate.com, Inc.***

/s/     Brian E. Haan
*Counsel for JEDI TECHNOLOGIES, INC.*