Sean D. Garrison (# 014436)
LEWIS & ROCA LLP
40 No. Central Avenue
Phoenix, Arizona  85004
Email:  SGarrison@LRLaw.com)
Tel:  (602) 262-5311
Fax:  (602) 262-5747

Heidi L. Keefe (Admitted Pro Hac Vice)
COOLEY LLP
5 Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
Tel: (650) 843-5000
Fax: (650) 849-7400

Attorneys for Defendant
Speeddate.com, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| JEDI TECHNOLOGIES, INC., an Arizona corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SPEEDDATE.COM, INC., a Delaware corporation,<br><br>　　　　　Defendant. | Case No.  11-cv-00304-TUC-JGZ<br><br>**DEFENDANT SPEEDDATE.COM, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |

Cooley LLP
Attorneys At Law
Palo Alto

SpeedDate's Responsive Claim
Construction Brief
11-cv-00304-TUC-JGZ

# Table of Contents

**Page**

I.    INTRODUCTION ............................................................................... 1

II.   BACKGROUND ................................................................................. 1

III.  APPLICABLE LAW ........................................................................... 4

IV.  ARGUMENT ...................................................................................... 6

    A.   "automated display of human participant-specific data" and "automatically displaying at least a portion of the sorted human specific data to at least one participant" ............................................... 6

        1.   "display" ................................................................................. 7

        2.   "automatic" ............................................................................ 8

        3.   The preamble is limiting .................................................... 9

    B.   "real-time network" ...................................................................... 10

    C.   "collecting human participant specific data" and "collecting user specific data and preferences" ............................................................ 11

    D.   "presenting to the human participant an on-line survey" ................. 13

    E.   "processing the stored human participant specific data, using the compatibility criteria" and "the compatibility criteria" ..................... 14

        1.   "comparing" ......................................................................... 14

        2.   "predetermined metrics" ..................................................... 15

        3.   "compatibility score" .......................................................... 16

    F.   "to determine interpersonal compatibility between at least two network participants" ...................................................................... 17

    G.   "compatibility criteria [that] includes at least one characteristic and a threshold" ............................................................................... 18

        1.   "characteristic" .................................................................... 19

        2.   "threshold" ........................................................................... 19

    H.   "applying the compatibility criteria to a plurality of records" ............ 19

    I.   "wherein the participant specific data includes a chat time a first participant is available to chat" ....................................................... 20

    J.   "to solicit an auto-response indicating whether the compatible participant wishes to chat with said first participant during the time indicated as available to chat" ....................................................... 22

        1.   "auto-response" .................................................................... 23

        2.   "chat" .................................................................................... 24

    K.   "personality trait derived from data provided by the user" and "psychological personality trait" .................................................... 24

    L.   "automatically prompting" ............................................................. 25

**Table of Contents**
**(continued)**

Page

M.    "accessing pre-existing data associated with a user" and "where the pre-existing data is available prior to initiation of collecting data for the user" ........................................................................... 25

N.    "and thereby indicating interpersonal compatibility between the users" ................................................................................................. 28

O.    "publicly available" ...................................................................... 28

V.   CONCLUSION ........................................................................................ 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Cooley LLP
ATTORNEYS AT LAW
PALO ALTO

ii.

**ANSWER TO COMPLAINT**
**11-CV-00304-CKJ**

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

CASES

4

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.*,
5
   289 F.3d 801, 808 (Fed. Cir. 2002) ................................................................. 10

6

*CCS Fitness, Inc. v. Brunswick Corp.*,
7
   288 F.3d 1359 (Fed. Cir. 2002) ................................................................... 5

8

*Edwards Lifesciences LLC v. Cook Inc.*,
   582 F.3d 1322, 1329 (Fed. Cir. 2009) ....................................................... passim
9

10

*K-2 Corp. v. Salomon S.A.*,
   191 F.3d 1356, 1364-65 (Fed. Cir. 1999) .................................................... 8

11

12

*Int'l v. Photoscribe Techs.*,
   628 F.3d 1359, 1373 (Fed. Cir. 2010) ........................................................ 5

13

14

*Lazare Kaplan Int'l v. Photoscribe Techs.*,
   628 F.3d 1359, 1373 (Fed. Cir. 2010) ........................................................ 5

15

16

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967, 977-98 (Fed. Cir. 1995) (en banc) ........................................ 4

17

18

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351, 1360 ................................................................................ 6

19

20

*Phillips v. AWH Corp.*,
   415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) ...............................4, 5, 6, 17

21

*Renishaw PLC v. Marposs Societa' per Azioni*,
22
   158 F.3d 1243 (Fed. Cir. 1998) ................................................................... 5

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iii.

1   Defendant SpeedDate.com, Inc. ("SpeedDate") respectfully submits this
2   responsive brief regarding the construction of claim terms of U.S. Patent Nos.
3   7,401,098 C1 (the "'098 patent") and U.S. Patent Nos. 7,885,977 B2 (the "'977
4   patent") (collectively the "patents-in-suit")[1].

5   **I.      INTRODUCTION**

6   Plaintiff Jedi Technologies, Inc. ("Jedi") seeks to broaden the claims of its
7   patent by attempting to avoid construction of many terms in dispute (in order to
8   make arguments later) and seeking broader constructions than supported by the
9   patent for other terms.   Where SpeedDate's constructions offer clarity as to the
10  meaning of the claims of the patent, Jedi offers only vagueness and ambiguity
11  through an outright refusal to construe terms that are in dispute.  This is particularly
12  true here, as much of the terminology used in the patent has no precise ordinary
13  meaning to one of skill in the art.  SpeedDate's constructions are supported by the
14  intrinsic record (including the specification and file history) as well as the extrinsic
15  evidence, while Jedi's are – as Jedi admits – merely reordering of the exact claim
16  terms whose meanings the parties dispute.  By keeping the meaning of the terms of
17  the patent ambiguous, Jedi will be able to improperly argue its proposed meaning of
18  these terms to the jury.

19  **II.     BACKGROUND**

20  The patents-in-suit are directed to matching users of an online system with
21  other, compatible users.  The '098 patent originally issued on July 15, 2008, but
22  was quickly placed into *ex parte* reexamination.    Only after substantial
23  amendments, including the abandonment of the broadest independent claims, did
24  the Patent Office allow the current amended and new claims of the '098 patent to
25  issue on May 10, 2011.  The '977 patent, the result of a continuation application of
26  the '098 patent, issued on February 8, 2011.  The subject matter of the two patents

27
28

---

[1] The '098 patent and '977 patents are attached as Exhibits 1 and 2, respectively, to the Declaration of Elizabeth Stameshkin.

Cooley LLP
Attorneys At Law
Palo Alto

1.

SpeedDate's Responsive Claim
Construction Brief
11-cv-00304-TUC-JGZ

is quite similar, and the parties have generally agreed that terms used in both patents, such as "compatibility criteria," should be construed the same way across the two patents.

The patents-in-suit each require the use of predetermined "compatibility criteria" to match users with each other. Each patent claims a system that (1) collects user data, including through the use of an on-line survey; (2) stores this data; (3) uses compatibility criteria to determine whether two users are compatible; and (4) prompts users with information regarding other compatible users. The primary difference between the claims of the '098 patent and the '977 patent is that the asserted claims of the '098 patent involve setting up a specific time at which both users are available to chat, while the asserted claims of the '977 patent involve, as part of the data collection step, receiving pre-existing data about the user.

Exemplary claim 4 of the '098 patent is reproduced below:

> A method for the automated display of human participant-specific data to a human participant of a real-time network, comprising the steps of:
>
> (a) collecting human participant specific data for a plurality of network participants, wherein said step of collecting human participant-specific data includes presenting to the human participant an on-line survey comprising a plurality of questions; and detecting and recording the human participant responses to the questions;
>
> (b) storing, in memory, the human participant specific data collected, wherein said step of storing the collected human participant-specific data includes creating at least one data table within a database that includes data for a plurality of human participants, and within said table storing at least one record containing information indicative of the human participant responses to the questions;

Cooley LLP
Attorneys At Law
Palo Alto

2.

SpeedDate's Responsive Claim
Construction Brief
11-cv-00304-TUC-JGZ

(c) processing the stored human participant specific data, using the compatibility criteria, to determine interpersonal compatibility between at least two network participants, wherein said step of processing the stored human participant-specific data includes retrieving at least one compatibility criteria, wherein the compatibility criteria includes at least one characteristic and a threshold, and applying the compatibility criteria to a plurality of records containing information indicative of the human participant responses in the data table within a database so as to determine the compatibility of the human participants;

(d) sorting said human participant specific data from a plurality of network participants by interpersonal compatibility; and

(e) automatically displaying at least a portion of the sorted human participant specific data to at least one participant in association with the network, wherein the participant-specific data includes a chat time a first participant is available to chat, and notifying compatible participants including e-mailing a compatible participant to solicit an auto-response indicating whether the compatible participant wishes to chat with said first participant during the time indicated as available to chat.

(Ex. 1, Claim 4.)  Exemplary claim 1 of the '977 patent is set forth below:

A method for automatically prompting compatible users of a network of their compatibility with at least another user, comprising:

collecting user specific data and preferences for a plurality of network users, including presenting to the users at least one on-line survey comprising a plurality of questions and detecting and recording the users' responses to the questions, wherein collecting user specific data includes accessing pre-existing data associated with a user, where the pre-existing data is available prior to initiation of collecting data for the user;

Cooley LLP
Attorneys At Law
Palo Alto

1
2
3
4
5

storing, in memory, at least a portion of the user specific data collected, including creating at least one data table within a database that includes data for a plurality of users, and within said table storing at least one record containing information indicative of the user's responses to the questions;

6
7
8
9
10
11

using compatibility criteria that includes at least one characteristic and a threshold, processing the stored user specific data to determine interpersonal compatibility between at least two network users, wherein processing includes applying the compatibility criteria to a plurality of records containing information indicative of the user responses in the data table to determine the interpersonal compatibility of the users;

12

sorting said user specific data, from a plurality of network users, by interpersonal compatibility; and

13
14
15
16

automatically prompting at least a portion of network users determined to have interpersonal compatibility and thereby indicating interpersonal compatibility between the users.

17

(Ex. 2, Claim 1.)

18

## III.    APPLICABLE LAW

19    Claim construction is a pure question of law for the Court.  *Markman v.*

20 *Westview Instruments, Inc.*, 52 F.3d 967, 977-98 (Fed. Cir. 1995) (en banc), *aff'd,*

21 517 U.S. 370 (1996).  Claim language is generally given "the meaning that the term

22 would have to a person of ordinary skill in the art in question at the time of the

23 invention, i.e., as of the effective filing date of the patent application." *Phillips v.*

24 *AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  However, the Court

25 must adopt an alternative construction "if the intrinsic evidence shows that the

26 patentee distinguished that term from prior art on the basis of a particular

27 embodiment, expressly disclaimed subject matter, or described a particular

28 embodiment as important to the invention." *Edwards Lifesciences LLC v. Cook*

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

4.

SPEEDDATE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
11-CV-00304-TUC-JGZ

1   *Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) (quoting *CCS Fitness, Inc. v. Brunswick*

2   *Corp.*, 288 F.3d 1359, 1366-67 (Fed. Cir. 2002)).  Similarly, the Court must adopt

3   an alternative construction when the patentee "acted as his own lexicographer and

4   clearly set forth a definition of the disputed claim term in either the specification or

5   prosecution history." *Id.*

6       As explained by the Federal Circuit in *Phillips*:

> The claims, of course, do not stand alone. Rather, they are
> part of "a fully integrated written instrument," consisting
> principally of a specification that concludes with the
> claims. For that reason, claims "must be read in view of
> the specification, of which they are a part." As we stated
> in *Vitronics*, the specification "is always highly relevant
> to the claim construction analysis. Usually, it is
> dispositive; it is the single best guide to the meaning of a
> disputed term.

14   *Id.* at 1315 (internal citations omitted).  "The construction that stays true to the

15   claim language and most naturally aligns with the patent's description of the

16   invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316

17   (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed.

18   Cir. 1998)).

19       A court may also turn to dictionaries in order to assist it in understanding the

20   underlying technology and the meaning of claim terms to one skilled in the art.

21   *Phillips*, 415 F.3d at 1318- 19; see also *Lazare Kaplan Int'l v. Photoscribe Techs.*,

22   628 F.3d 1359, 1373 (Fed. Cir. 2010) ("[C]ourts are free to consult dictionaries

23   'and may . . . rely on dictionary definitions when construing claim terms, so long as

24   the dictionary definition does not contradict any definition found in or ascertained

25   by a reading of the patent documents.'") (quoting *Phillips*, 415 F.3d at 1322).

26   However, the best guide for determining the meaning of claim terms remains the

27

28

Cooley LLP
Attorneys At Law
Palo Alto

5.

SpeedDate's Responsive Claim
Construction Brief
11-cv-00304-TUC-JGZ

intrinsic record, including the patent itself and the file history.  *Phillips*, 415 F.3d at 1318-19; *Edwards*, 582 F.3d at 1327-28.

IV.     **ARGUMENT**[2]

A jointly prepared claim chart was submitted to the Court on December 12, 2011, identifying the terms in dispute.

A.     **"automated display of human participant-specific data" and "automatically displaying at least a portion of the sorted human specific data to at least one participant"**

| Claim Term | SpeedDate's Construction | Jedi's Construction |
|---|---|---|
| automatically displaying at least a portion of the sorted human participant specific data to at least one participant | visually presenting on a screen at least a part of at least one other user's data to a first user, wherein such presentation occurs without user intervention | Providing at least a portion of the sorted data specific to individual network participants to at least one participant without requiring the participant to click on the profiles of every participant to determine compatibility |
| automated display of human participant-specific data | visual presentation of data associated with a user on a screen, wherein such depiction occurs without user intervention | Preamble is not a limitation. If the Court determines a construction is necessary, Jedi proposes: Automated display of data specific to individual network participants |

---

[2] Despite claim construction being about the claim terms of the patents themselves, and not the accused product, Jedi has insisted on injecting claim charts demonstrating Jedi's theories of infringement.  Despite their impropriety, in several instances, these charts help demonstrate the reasons Jedi appears to be refusing to construe certain claim terms and reiterates the need for the Court to resolve these disputes now.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.").

Cooley LLP
Attorneys At Law
Palo Alto

6.

SpeedDate's Responsive Claim
Construction Brief
11-CV-00304-TUC-JGZ

1    The primary disputes regarding these claim terms are as follows: (1) whether

2    "display" should be construed to mean a "visual presentation on a screen"; and (2)

3    the proper construction of the term "automatic;" and (3) whether the preamble is

4    limiting.

5         **1.      "display"**

6    First, with regard to the phrase "display of human participant specific data,"

7    SpeedDate relies on intrinsic evidence demonstrating this phrase means "visual

8    presentation of data associated with a user on a screen," and that, similarly,

9    "displaying" means "visually presenting on a screen."  In multiple instances, the

10   specification refers to the fact that a display is a "visual representation."  For

11   example, the '098 patent discloses that "the simple process of *displaying* a table, or

12   similar *visual representation*, of chatter profile information in association with an

13   ongoing chat session may prove, in and of itself, a valuable feature."  (Ex. 1, '098

14   patent at 5:63-67 (emphasis added).)  Similarly, in describing one embodiment, the

15   '098 patent explains that "the *display* region 312 includes a *visual representation* of

16   another chatter or 'family member.'"  (Ex. 1, '098 patent at 14:39-41 (emphasis

17   added).)  In describing prior art systems, the '098 patent discloses that a profile

18   containing user data would be "revealed graphically, to other chatters in a *visual*

19   *display* window should the other chatters choose to look at such a profile."  (Ex. 1,

20   '098 patent at 4:2-8 (emphasis added).)  Meanwhile, Figure 8 of the '098 patent sets

21   forth an "exemplary user-interface *screen*."  (Ex. 1, '098 patent at Fig. 8.)  Thus, it

22   is difficult to comprehend how a display would not constitute a "visual presentation

23   of data . . . on a screen."

24   In contrast, Jedi seeks to define the term "display" to mean "provide."

25   However, Jedi's proposed construction would broaden the claims of the patent

26   beyond their actual scope.  The inventor of the '098 patent chose to use the

27   narrower term "display," not "provide."  Despite Jedi's claim that "providing" and

28   "displaying" are used "interchangeably," that characterization is inaccurate.

Cooley LLP
Attorneys At Law
Palo Alto

7.

SpeedDate's Responsive Claim
Construction Brief
11-cv-00304-TUC-JGZ

1    Rather, displaying is a narrow *subset* of providing, and thus cannot be used

2    "interchangeably" in claim construction.   A person can provide their credit card

3    number over the phone, but that would hardly constitute the display of that credit

4    card number.   That the '098 patent recognizes that the prior art "provides *or*

5    displays" information is hardly evidence that the inventor intended to encompass all

6    forms of "providing" when using the term "display."   Yet that is what Jedi's

7    improper construction would allow.

8           With regard to Jedi's argument that SpeedDate's construction could "force

9    Claim 4 into a 'joint infringement' situation," (Jedi Br. at 9), this should not be the

10   Court's concern at claim construction.   The patent's claims require a step of

11   "display."   To the extent this claim language would require steps to be performed

12   by an end user – such as the display of information by an end user's machine – it is

13   not the Court's or Jedi's prerogative to ignore such language.   *See K-2 Corp. v.*

14   *Salomon S.A.*, 191 F.3d 1356, 1364-65 (Fed. Cir. 1999) ("Courts do not rewrite

15   claims.").   Jedi's frustration that it must face some "burden" at trial to prove its

16   infringement case should have no effect on the Court's claim construction.

17                     **2.        "automatic"**

18          Despite Jedi's attempts to poke fun at SpeedDate's construction of

19   "automatically," Jedi proposes a confusing and inaccurate construction.   Jedi

20   proposes that "automatically" means "without requiring the participant to click on

21   the profiles of every participant to determine compatibility."   The '098 patent states

22   that profile information may be "automatically displayed," which thereby  "saves

23   chatters time by not requiring them to click on the profiles of every chatter within

24   the system to determine the compatibility of said chatters." (Ex. 1, '098 patent at

25   6:16-21.)   However, this language hardly means that "automatically" means

26   "without requiring the participant to click on the profiles of every participant to

27   determine compatibility."   Rather, the patent touts a *benefit* of the automatic display

28

1    over the prior art – now the user does not have to click on profiles.  *See Edwards*,
2    582 F.3d at 1333.

3          In fact, the '098 patent explains that because its system is "automated,"
4    "instead of waiting for a chatter to click *a* button to review *a* profile . . . the system
5    will automatically notify or page the chatters to be introduced."  (Ex. 1, '098 patent
6    at 5:52-60 (emphasis added).)  Thus, rather than not requiring a user to click on
7    "every" profile, it does not require the user to click on *any* profile.  *See Edwards*,
8    582 F.3d at 1333.  Under Jedi's construction, a system could require a user to click
9    on twenty profiles, so long as after doing so the link to one profile did not have to
10   be clicked.  This is a nonsensical broadening of the claims that could cover systems
11   specifically taught away from by the '098 patent.

12         In fact, these examples in the specification support SpeedDate's construction.
13   The *automation* of the system leads to benefits because the user need not click on
14   any profiles – and thus need not take any action – for the system to provide the user
15   with data regarding another compatible user.   SpeedDate's construction is further
16   supported by extrinsic evidence.  For example, the IBM Dictionary of Computing
17   defines "automate" to mean "to convert a process or equipment to automatic
18   operation," while defining "automatic" to mean "pertaining to a process or device
19   that, under specified conditions, functions *without intervention by a human*
20   *operator*."  (Ex. 3 at 42 (emphasis added).)

21         Thus, the Court should adopt SpeedDate's construction of these terms as its
22   constructions are accurate and supported by both the intrinsic and extrinsic
23   evidence.  *See Edwards*, 582 F.3d at 1333 (constraining definition to one used by
24   the patentee to distinguish around prior art).

25              **3.        The preamble is limiting**

26         Regardless of whether the preamble is limiting, SpeedDate has provided
27   similar constructions for these two phrases – one of which does not appear in the
28   preamble.  Nevertheless, Jedi inaccurately argues that the preamble of Claim 4 of

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

9.

SPEEDDATE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
11-CV-00304-TUC-JGZ

the '098 patent is not limiting.  The preamble includes the following language: "A method for the automated display of human participant-specific data to a human participant of a real-time network . . .".  (Ex. 1, '098 patent, Cl. 4.)   Thus, the preamble requires the participant to be part of a "real-time network" – a term that Jedi admits appears only in the preamble of Claim 4.  Contrary to Jedi's assertion that this term is used "only to state a purpose or intended use for the invention," the preamble adds the requirement that the data be displayed to users of a "real-time network."  (Ex. 1, '098 patent, Claim 4 (emphasis added).)   The preamble is limiting because it "recit[es] additional structure or steps underscored as important by the specification." *Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).  As the *title* of the patent includes the term "real-time,"  it is hard to imagine that the requirement that the network be "real-time" is unimportant to the invention.

## B. "real-time network"

| **Claim Term** | **SpeedDate's Construction** | **Jedi's Construction** |
|---|---|---|
| "real-time network" | a network that simulates a live experience | Preamble is not a limitation. If the Court determines a construction is necessary, Jedi proposes:<br><br>Computer network allowing for immediate communication |

The parties have two main disputes with regard to the term "real-time network.  First, as discussed in Section IV.A.3, the parties dispute whether the preamble to Claim 4 is limiting.  Second, the parties dispute the proper construction of the term "real-time network."

SpeedDate proposes that the Court construe the term "real-time network" to mean "a network that simulates a live experience."  This definition is consistent

Cooley LLP
Attorneys At Law
Palo Alto

10.

SpeedDate's Responsive Claim
Construction Brief
11-cv-00304-TUC-JGZ

with the ordinary meaning to one of skill in the art.  According to Webster's, "real-time" means "the actual time during which something takes place."  (Ex. 4.) Random House similarly defines the term as "of or relating to computer applications or processes that can respond immediately to user input."  (Ex. 5 at 1100.)  Meanwhile, the very nature of the term "chatting," as described in the '098 patent, implies an attempt to simulate an in-person "chat" between two users.  Thus, Jedi's argument that SpeedDate's construction would exclude "chatting" is a straw man.  Nothing about SpeedDate's construction requires users to "sit[] across the table" from each other.

Jedi's proposed construction, on the other hand, once again attempts to broaden its claims to include forms of communication that are not real-time. "Immediate communication" could include email – after all, email is a form of communication, and is capable of being instantly sent and received.  However, email does not simulate the live experience of communication between two users, and should not be considered to be "real-time" communications.  Thus, SpeedDate's construction is the proper one, and the Court should adopt it.

**C.**    **"collecting human participant specific data" and "collecting user specific data and preferences"**

| Claim Term | SpeedDate's Construction | Jedi's Construction |
|---|---|---|
| "collecting human participant specific data" | MODIFIED: collecting data about a user | Plain and ordinary meaning.  If the Court determines a construction is necessary, Jedi proposes:<br><br>Collecting data specific to individual network participants |
| "collecting user specific data and preferences" | MODIFIED: collecting data about a user and information regarding qualities a user desires in a match | Plain and ordinary meaning.  If the Court determines a construction is necessary, Jedi proposes:<br><br>Collecting data and preferences |

Cooley LLP
Attorneys At Law
Palo Alto

11.

SpeedDate's Responsive Claim
Construction Brief
11-CV-00304-TUC-JGZ

| | | specific to individual network participants |
| --- | --- | --- |

The parties had three main disputes with regard to these claims, but SpeedDate believes that one may be resolved through SpeedDate's modified proposals, set forth in the chart above.  While SpeedDate's original proposed constructions for these terms defined the term "collecting" as "retrieving," SpeedDate will stipulate to using the term "collecting" in the construction of these terms.

Second, Jedi proposes that "human participant specific data" be construed as "data specific to individual network participants."  However, this phrasing is inaccurate and confusing.  For example, data such as "age" or "marital status" is not specific to one individual.  Rather, it is data "about" an individual that could be shared by many.  The specification supports this construction, noting that the chat windows "depict profile information that each chatter has entered *about* themselves."  (Ex. 1, '098 patent at 9:41-46.)  Thus, SpeedDate's construction is supported by both logic and the intrinsic record.

With regard to the term "preferences," Jedi refuses to construe the term, despite the fact that the specification uses the term only in a narrow fashion.  A user's "preference" for lemon scented dishwashing liquid, for example, has little applicability to a user's "preferences" that are taken into account by the system and used to determine matches.  Rather, the term is used consistently throughout the specification to mean "compatibility" preferences – that is, those qualities a user wants its match to have.  (Ex. 1, '098 patent at 6:16-19 ("The IDPP uses the profile information and preset compatibility preferences of all chatters that are logged into the Chat Room system in order to determine interpersonal compatibility.").)  Jedi's main issue with SpeedDate's construction appears to be SpeedDate's use of the term "qualities," which Jedi contends would not encompass "marital status" and

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

12.

SPEEDDATE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
11-CV-00304-TUC-JGZ

"age."[3]   However, Webster's II New College Dictionary defines the term "quality" as an "inherent or distinguishing attribute" or "property," which would certainly include marital status and age.  (Ex. 6 at 905.)   Thus, Jedi's argument that a preference that a potential match be single would somehow not be a "quality desired in a match" fails, and SpeedDate's modified proposal should be adopted.

### D.    "presenting to the human participant an on-line survey"

| Claim Term | SpeedDate's Construction | Jedi's Construction |
|---|---|---|
| "presenting to the human participant an on-line survey" | causing an on-line survey to be visually depicted on a screen to a user | Plain and ordinary meaning |

Here, the parties agree that the term "on-line survey" need not be construed. Thus, the only point of dispute between the parties is whether "presenting" should be left unconstrued or whether it should be construed to mean "causing . . . to be visually depicted on a screen," as proposed by SpeedDate.  Logically, it is hard to understand how a user could be "presented" with an "on-line survey" that is not "visually depicted on a screen."  Notably, Figure 1 shows multiple users of a chat system, with the users depicted by various types of screens.  (Ex. 1, '098 Fig. 1.) While Jedi argues that SpeedDate's construction is somehow "importing" a limitation from the specification, it has failed to explain how such a system would be able to display and present information to an end user without using a screen. Thus, SpeedDate's accurate construction should be adopted by the Court.

---

[3] Jedi quotes the '098 patent's disclosure that "[d]ata required for comparison may be as simple as marital status, need for employment, religious preferences, or age." ('098 patent at 6:49-52.)  However, this is a description of "data" that is compared – not "preferences," a separate category of information associated with the user, as explained in the language of Claim 1 of the '977 patent ("collecting user specific data *and* preferences") (emphasis added).

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

13.

SPEEDDATE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
11-CV-00304-TUC-JGZ

**E.** **"processing the stored human participant specific data, using the compatibility criteria" and "the compatibility criteria"**

| Claim Term | SpeedDate's Construction | Jedi's Construction |
|---|---|---|
| "processing the stored human participant specific data, using the compatibility criteria" | using predetermined metrics to compare multiple users' data | processing the stored data specific to individual network participants, using the criteria for determining that two or more people are compatible |
| "the compatibility criteria" | predetermined metrics used to determine a compatibility score between and among two users | criteria for determining that two or more people are compatible |

The primary dispute with regard to these two phrases is that SpeedDate attempts to construe otherwise ambiguous language such as "compatibility criteria" and "processing," while Jedi is content with leaving the terms ambiguous and subject to future argument between the parties as to their meaning. Jedi accuses SpeedDate of importing limitations from the specification into the claims, but SpeedDate's goal is only to ensure the claims of the patent are limited to the actual invention claimed and described, and not impermissibly broadened to the point of ambiguity.

**1.** **"comparing"**

Jedi first asserts that "processing" the data "using the compatibility criteria" does not constitute "comparing data." While Jedi claims that this step includes "retrieving . . . at least one characteristic and a threshold" and "applying the compatibility criteria to a plurality of records," each of these are *substeps* within the "processing" step. That the step of comparing the two users' information includes both retrieving the criteria and applying the criteria to the users' data in order to ultimately compare this data is beside the point.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

14.

SPEEDDATE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
11-CV-00304-TUC-JGZ

1    The patentee repeatedly uses the term "compare" when referring to the
2    events that occur during this "processing" step.   For example, the '098 patent
3    explains that "[t]he data that is saved into the system memory can be used to
4    *compare* such data to the archived data of all other chatters within the Chat Room
5    system." (Ex. 1, '098 patent at 6:35-38.)   Notably, "[i]t does not matter which
6    system is used for identifying these facets [of a user's personality], as the IDPP
7    system will *compare* any and all data contained in chatters' profiles in order to page
8    and Introduce two or more of said chatters." (Ex. 1, '098 patent at 6:54-58; *see also*
9    Ex. 1, '098 patent at 11:65-67; 12:2-6; 13:36-39.)   Thus, SpeedDate's construction
10   of "processing" to mean "comparing" is appropriate and supported by the intrinsic
11   record.

12           **2.        "predetermined metrics"**

13       Jedi also argues that compatibility criteria need not be "predetermined."  Its
14   primary argument is that the preamble of Claim 6 uses the term "predetermined" in
15   describing criteria, while Claim 4 does not.   However, later in Claim 6, the
16   "predetermined criteria" mentioned in the preamble are simply referred to as
17   "compatibility criteria."   Thus, it appears that the patentee was actually using the
18   terms interchangeably, rather than to identify unique types of criteria.   Moreover,
19   "[d]ifferent terms or phrases in separate claims may be construed to cover the same
20   subject matter where the written description and prosecution history indicate that
21   such a reading of the terms of phrases is proper." *Edwards*, 582 F.3d at 1330.

22       Logically, it is difficult to imagine criteria that are not "predetermined."  The
23   '098 patent explains that "[t]he Compatibility Criteria used by the IDPP can be
24   identified and determined by well-established psychological methods" and that "the
25   IDPP may use the results of standard industry personality typing tests." (Ex. 1,
26   '098 patent at 6:22-24, 39-40.)   Thus, "well-established" and "standard" methods
27   are used by the system, as well as predetermined categories of user data to collect

28

Cooley LLP
Attorneys At Law
Palo Alto

15.

SpeedDate's Responsive Claim
Construction Brief
11-cv-00304-TUC-JGZ

1   and compare such as "marital status . . ., need for employment, religious

2   preferences, or age." (Ex. 1, '098 patent at 6:49-52.)

3         With regard to the use of the term "metrics," the specification in fact uses

4   this term when referring to compatibility criteria. ('098 patent at 11:17-18 (the

5   system is designed to "retrieve profile and compatibility metrics from a database").)

6   Every example of compatibility criteria throughout the specification could, and

7   should, be termed a "metric" – including both the "simple match" and "scoring"

8   examples highlighted in Jedi's briefing. Webster's II New College Dictionary

9   defines "metric" to mean "a standard of measurement." (Ex. 6 at 690.) The

10  compatibility criteria constitute a system intended to measure how compatible two

11  users would be. This "more scientific" term should be adopted by the Court as it

12  properly defines the term "criteria," using the patentee's own words, while denying

13  Jedi the opportunity to argue for an ambiguous, unlimited construction of the term

14  "criteria."

15          3.      "compatibility score"

16        Jedi's other primary disagreement with SpeedDate's proposed construction

17  of "compatibility criteria" is that SpeedDate has included the concept of a

18  "compatibility score." However, the specification is replete with references to a

19  compatibility score. (*See, e.g.*, Ex. 1, '098 patent at 9:53-55 ("the IDPP system

20  determines that the compatibility score is favorable for interpersonal

21  compatibility"); 10:26-29 ("As a result of the compatibility comparison, the IDPP

22  system determines that the compatibility score is favorable for interpersonal

23  compatibility"); 11:18-21 ("run a program to 'calculate' the compatibility of at least

24  one chatter with another chatter and return a score representing the compatibility").)

25  *See Edwards*, 582 F.3d at 1330. Based on the language of Claim 4, including the

26  requirement that the compatibility criteria include a "threshold" for determining a

27  match, it is difficult to determine how the system could not include a scoring

28  mechanism.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

16.

SPEEDDATE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
11-CV-00304-TUC-JGZ

While Jedi asserts that the specification discloses that a scoring system is optional, by imposing the requirement of a threshold in Claim 4, some scoring mechanism is required in order to determine whether or not a threshold has been met.  For example, Jedi emphasizes an embodiment that states that a "threshold for compatibility" is a "match (e.g., equals or opposites)." (Jedi Br. at 22.)  However, this itself *is* a scoring mechanism, whereby a user is scored as either a "match" or a "not match."  Thus, the Court should adopt SpeedDate's proposed constructions of these terms, which recognize how the system must actually operate, rather than leaving the terminology vague, ambiguous, and open to abuse.

**F.**     **"to determine interpersonal compatibility between at least two network participants"**

| Claim Term | SpeedDate's Construction | Jedi's Construction |
|---|---|---|
| "to determine interpersonal compatibility between at least two network participants" | to determine how well two users would be able to exist, live together, or work successfully with each other | To determine the compatibility between two or more people who are network participants. |

The primary dispute between the parties with regard to this claim term is whether the term "compatible" should be construed.  SpeedDate construes this term by relying on a definition of the term "compatible" set forth by the patentee in U.S. Provisional Application No. 60/185,858, part of this patent's prosecution history. The Provisional Application specifically defines "compatible" as "able to exist, live together, or work successfully with (something or someone else)."  (Ex. 7, Provisional Application at 6.)  When a patentee sets forth a precise definition for a term, as in this instance, such lexicography governs.  *Phillips*, 415 F.3d at 1316.

Jedi, however, argues that no construction is necessary and that SpeedDate's construction is improper because it includes a "list."  In support of this premise, Jedi cites irrelevant case law regarding attempts by parties to narrow a construction

Cooley LLP
Attorneys At Law
Palo Alto

17.

SpeedDate's Responsive Claim
Construction Brief
11-CV-00304-TUC-JGZ

by inserting a list of examples into a proposed definition.  However, SpeedDate is not attempting to insert such a list of "examples" into its construction – rather, SpeedDate simply turned to the intrinsic evidence, found that the patentee had specifically defined the term "compatible," and incorporated that definition into its construction.  *See Edwards*, 582 F.3d at 1329 ("[W]e will adopt a definition that is different from the ordinary meaning when 'the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history.'").  As SpeedDate's construction comports with both the law and the intrinsic evidence, it should be adopted.

**G.**    **"compatibility criteria [that] includes at least one characteristic and a threshold"**

| Claim Term | SpeedDate's Construction | Jedi's Construction |
|---|---|---|
| "compatibility criteria [that] includes at least one characteristic and a threshold" | predetermined metrics used to determine a compatibility score for two users [that] include (1) at least one facet that can be used to determine "compatibility" between two users; and (2) a threshold "compatibility" score, above which a match is determined to exist between two users and below which a match is not determined to exist | criteria for determining that two or more people are compatible [that] includes one or more characteristics of a person and a threshold for matching people |

The primary disagreements between the parties with regard to this phrase are (1) whether the phrase "compatibility criteria" should be construed as "predetermined metrics" or "criteria for determining that two or more people are compatible," as discussed in Section IV.E.2; (2) whether the term "characteristic" should be construed; (3) whether a "compatibility score" is required in order to determine whether a threshold has been met, as discussed in Section IV.E.3; and (4) whether the concept of a threshold should be explained.  As SpeedDate has already

addressed issues (1) and (3), SpeedDate addresses just the terms "characteristic" and "threshold" below.

### 1.   "characteristic"

Jedi has proposed no construction for the term "characteristic." SpeedDate, on the other hand, proposes the Court construe "characteristic" to mean "at least one facet that can be used to determine 'compatibility' between two users." The language of the claims and the subject matter of the invention require that characteristics be used to determine compatibility between users. The specification describes such characteristics as "facets" of a user's personality. For example, the '098 patent describes processes that "are intended to identify facets of a chatter's personality. It does not matter which system is used for identifying these facets . . . ." (Ex. 1, '098 patent at 12:1-3; *see also* 6:53-55.) Thus, SpeedDate's construction comports with the specification and properly narrows the type of characteristic to one that would be used by the system to determine compatibility. *See Edwards*, 582 F.3d at 1329-30.

### 2.   "threshold"

Jedi also fails to explain what a "threshold" is. Merriam-Webster's Collegiate Dictionary defines "threshold" just as SpeedDate describes it – "a level, point, or value above which something is true or will take place and below which it is not or will not." (Ex. 8 at 1229.) SpeedDate's construction explains that there must be a "threshold" above which a match is determined to exist between two users and below which a match is not determined to exist. This additional explanation is accurate, helpful to the trier of fact and should be included in order to properly construe the term.

### H.   "applying the compatibility criteria to a plurality of records"

| Claim Term | SpeedDate's Construction | Jedi's Construction |
|---|---|---|
| "applying the | using predetermined metrics | Applying to a plurality of |

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

19.

SPEEDDATE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
11-CV-00304-TUC-JGZ

| compatibility criteria to a plurality of records" | to generate compatibility scores between two users | records the criteria for determining that two or more people are compatible |

The primary dispute with regard to this phrase is whether or not this phrase is "clear on its face" as Jedi contends.  However, "applying" is an extremely broad term that could be used in many different manners.  Simply stating that "criteria" are "applied" to records does not explain what precisely must happen to practice this claim.   In the context of the specification, however, the step of "applying criteria to records" appears to mean using the criteria[4] to generate compatibility scores between two users.  For example, the '098 patent explains that the system consists in part of a program to "'calculate' the compatibility of at least one chatter with another chatter and return a score representing the compatibility." (Ex. 1, '098 patent at 11:18-21.)   Thus, SpeedDate's construction should be adopted by the Court.

## I.    "wherein the participant specific data includes a chat time a first participant is available to chat"

| **Claim Term** | **SpeedDate's Construction** | **Jedi's Construction** |
| --- | --- | --- |
| "wherein the participant specific data includes a chat time a first participant is available to chat" | wherein the data associated with a first user includes a specific time designated by the first user that the first user will be available to communicate in real-time online | Wherein the data specific to individual network participants includes a chat time a first participant is available to chat |

The primary dispute between the parties as to this term is how broadly the phrase "a chat time a first participant is available to chat" may be read.  Jedi once again asserts that this term is "clear on their face."  However, Jedi's infringement

---

[4] SpeedDate has previously discussed why the Court should construe "compatibility criteria" to mean "predetermined metrics."  *See* Section IV.E.2, *supra*.

1    contentions show just how broadly Jedi intends to read this phrase, despite the clear

2    disclosure of the specification and file history limiting this phrase.

3         For instance, Jedi's contentions set forth that the SpeedDate system sends an

4    email that informs a second user that a first user is "online now." (Jedi Br., Ex. C at

5    19.)  Jedi apparently contends that the knowledge by the system at the time it sent

6    that email that the first user is "online" is sufficient to meet the limitation of "a chat

7    time a first participant is available to chat."   However, if the system has no

8    information other than the user's on-line or off-line state at the time of sending an

9    email, this is insufficient for the system to claim that such a user is "available to

10   chat" at a "chat time."  For example, the user could be on-line but away from his or

11   her computer.  Additionally, by the time the system sends a message to the second

12   user stating that the first user is "online now," the first user could have signed off.

13   In both scenarios, the system has failed to inform the second user of a time that the

14   first user is available to chat – because the system does not have data that sets forth

15   a chat time a user is actually available to chat.   Therefore, while SpeedDate

16   contends that one of ordinary skill in the art would never read the plain language of

17   the claims to include the accused functionality, it must provide a construction as

18   Jedi wishes to twist the "ordinary meaning" of the claim terms in order to establish

19   its infringement case.

20        SpeedDate's proposed construction is supported by the specification and the

21   actual language of the claim.  The '098 patent describes two "paging" scenarios in

22   which a user is informed of another user's availability to chat.  In the first scenario,

23   a "chatter #1 . . . provides the chat room server information that he plans to be

24   logged into the chat room for a certain period of time."  The system then sends

25   offline, compatible participants "an e-mail stating that chatter #1 is logged into the

26   system and that he will be there for a given period of time (chat time)."[5]  (Ex. 1,

27   _____

28   [5] Jedi's concern regarding SpeedDate's inclusion of "specific" is unjustified,
     particularly as the '098 patent discloses that, in scenario 1, chatter #2 "is notified

'098 patent at 13:3-12.)  In the second scenario, chatter #1 "goes to the chat website and tells the chat room server that he will be online . . . for a certain period of time . . . after which he can leave the site."  Chatter #2 does the same thing.  When the system determines the chatters are compatible, it emails both chatters with information, including soliciting a response from the chatters to determine at what time the chatters will log into the system.  (Ex. 1, '098 patent 13:27-36.)

Thus, in both disclosed scenarios regarding informing a user of another user's availability to chat, a first user has *provided* chat time availability information to the system.  (*See also* Ex. 1, '098 patent, Fig. 5 (step 254: specify expected on-line time); Fig. 6 (steps 204 and 214: notify server of availability)).  As explained previously, mere knowledge by the system of a user's immediate on-line or off-line state is insufficient to determine a chat time that user is actually available to chat.  As SpeedDate's constructions take into account the specification and the plain language of the claims, the Court should adopt SpeedDate's construction of this term.

J.    **"to solicit an auto-response indicating whether the compatible participant wishes to chat with said first participant during the time indicated as available to chat"**

| **Claim Term** | **SpeedDate's Construction** | **Jedi's Construction** |
|---|---|---|
| "to solicit an auto-response indicating whether the compatible participant wishes to chat with said first participant during the time indicated as available to chat | MODIFIED:  to seek a selection by a second user, determined to be compatible with the first user, as to whether or not the second user wishes to communicate in real-time online with the first user at the specific time designated by the first user, and wherein were the second user to make such a selection a response would be sent without further user intervention | To allow a compatible network participant to make a selection indicating whether he/she wishes to chat with the other person during the time indicated as available to chat |

that chatter #1 is available to chat for the *specified* time."  ('098 patent at 13:20-22.)

Cooley LLP
Attorneys At Law
Palo Alto

22.

SpeedDate's Responsive Claim
Construction Brief
11-CV-00304-TUC-JGZ

1   The parties have several disputes regarding this phrase.  As discussed in

2   Section IV.I, the parties dispute whether the phrase "the time indicated as available

3   to chat" should be construed as "the specific time designated by the first user."

4   Unique to this phrase, however, are two disputes:  First, the parties dispute whether

5   upon selection, "a response is sent without further user intervention."  Second, the

6   parties dispute whether the term "chat" should be construed.

7               1.      **"auto-response"**

8           Any construction of this phrase must account for the term "auto-response,"

9   but  Jedi's construction ignores this limitation entirely.  SpeedDate's construction

10  first relies on the specification, which explains that an email sent to a second user

11  allows them to make an "auto-response selection" as to whether or not they wish to

12  chat with the first user.  (Ex. 1, '098 patent at 13:39-44.)  Unfortunately, the patent

13  does not give any additional explanation as to what an "auto-response" would be.

14  Using extrinsic evidence, such as the previously cited IBM Dictionary of

15  Computing definition of "automatic," and reviewing that evidence in the context of

16  the specification, it appears that by "soliciting" an "auto-response," the system is

17  seeking an automatic response – that is a response sent without further user

18  intervention – once a user makes a selection.  (*See* Ex. 1, '098 patent at 13:39-44;

19  Ex. 3 at 42.)

20          Jedi's final argument against SpeedDate's original proposed construction is

21  that it would open the door for a joint infringement challenge.  SpeedDate did not

22  mean to imply that the claim required that a response actually be sent by the user.

23  Thus, SpeedDate's modified construction takes that into account, and makes it

24  conditional that only if the user were to make such a selection would a response be

25  automatically sent.

26          Thus, as SpeedDate's construction relies on intrinsic and extrinsic evidence,

27  and accounts for the term "auto-response," SpeedDate's construction should be

28  adopted.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

23.

SPEEDDATE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
11-CV-00304-TUC-JGZ

2. **"chat"**

SpeedDate's construction merely attempts to clarify the term "chat," which Jedi does not define.   Jedi has not provided any reasons that SpeedDate's construction, "communicate in real-time online" is inaccurate.   In fact, the Provisional Application on which the specification was based explains that chat room software would enable users to "communicat[e] in real-time via the network protocol . . . ." (Ex. 7 at 8.)   Thus, SpeedDate's construction of chat is correct and should be adopted by the Court.

K.   **"personality trait derived from data provided by the user" and "psychological personality trait"**

| Claim Term | SpeedDate's Construction | Jedi's Construction |
|---|---|---|
| "personality trait derived from data provided by the user" | MODIFIED: a personality trait calculated by the system from data provided by the user using predetermined metrics | Plain and ordinary meaning |
| "psychological personality trait" | MODIFIED: a personality trait relating to psychology | Plain and ordinary meaning |

One primary dispute between the parties was that SpeedDate had suggested using the term "facet" to define "trait."   However, SpeedDate will stipulate to use of the term "trait" instead, as set forth in its modified constructions, nullifying this dispute.

Otherwise, the parties dispute whether "derived" means "calculated by the system . . . using predetermined metrics."   Predetermined metrics – or a system of measurement that is known to the system prior to the receipt of a user's data – must be used in order to "derive" a personality trait.   For example, if a user provides answers to Myers Briggs Personality test, the system must have some way of using those answers to "determine a psychological profile."  (Ex. 1, '098 patent at 10:59-62.)   That is, the system must be able to take that data and measure whether or not

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

24.

SPEEDDATE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
11-CV-00304-TUC-JGZ

that data fits with various personality profiles, such as "answers [that] may show tendencies to voice emotions more or less than another person." (Ex. 1, '098 patent at 10:62-64.)

## L.   "automatically prompting"

| Claim Term | SpeedDate's Construction | Jedi's Construction |
|---|---|---|
| "automatically prompting" | prompting [compatible users] without user intervention | Preamble is not a limitation. If the Court determines a construction is necessary, Jedi proposes:<br><br>Notifying, without requiring users to click on the profiles of every participant to determine compatibility |

As explained in paragraph IV.A.2, *supra*, Jedi's construction of "automatic" to mean "without requiring users to click on the profiles of every participant to determine compatibility" is unsupported by the intrinsic or extrinsic evidence. Each of Jedi's citations to the patent specification in fact support SpeedDate's construction. For example, that "the IDPP may be employed to notify a user of other chatters' characteristics without having to click on links to find other chatters' profile information" means that this notification occurs "without user intervention," such as clicking on *any* link at all. (Jedi Br. at 30.) Thus, the Court should adopt SpeedDate's construction.

## M.   "accessing pre-existing data associated with a user" and "where the pre-existing data is available prior to initiation of collecting data for the user"

| Claim Term | SpeedDate's Construction | Jedi's Construction |
|---|---|---|
| "accessing pre-existing data associated with a user" | MODIFIED:  obtaining data associated with a user that existed prior to a user providing data to the system | Plain and ordinary meaning |

Cooley LLP
Attorneys At Law
Palo Alto

25.

SpeedDate's Responsive Claim
Construction Brief
11-CV-00304-TUC-JGZ

| "where the pre-existing data is available prior to initiation of collecting data for the user" | where the pre-existing data is available for use by the system before | Plain and ordinary meaning |
|---|---|---|

As it has throughout the claim construction process, Jedi refuses to construe these terms, despite the parties' disagreement as to their meaning.  SpeedDate actually agrees that the plain meaning of these terms would normally govern. Unfortunately, Jedi chose to inject its flawed infringement contentions into the claim construction briefing, making it apparent that Jedi wishes to broaden the scope of its claims by effectively rendering the limitation that the pre-existing data be "available prior to initiation of collecting data for the user" superfluous.  Thus, SpeedDate must propose its constructions, which it contends are the actual plain and ordinary meaning of the claim language.  Otherwise, Jedi will feel free to argue its twisted version of "plain and ordinary meaning" to the jury, effectively putting claim construction, a question of law, in the hands of the trier of fact.

First, aside from SpeedDate's use of the phrase "linked" to describe data associated with a user, Jedi does not appear to have significant issues with SpeedDate's proposed construction of "accessing pre-existing data associated with a user."  All that SpeedDate was attempting to express was that the data must be in some manner connected, or "linked", with a specific user. Regardless, SpeedDate is willing to modify its proposal to replace the word "linked" with "associated."

Jedi also does not take issue with SpeedDate's requirement that "pre-existing" data must have existed prior to the user providing data to the system.  This makes sense, as the data must "pre-exist" some point in time – in this case, the step of collecting user specific data.  Otherwise, it would not be "pre-existing" data at all, or would be an insolubly ambiguous term.  Thus, regardless of any additional

Cooley LLP
Attorneys At Law
Palo Alto

26.

SpeedDate's Responsive Claim
Construction Brief
11-cv-00304-TUC-JGZ

limitations, the pre-existing data must be *in existence* prior to collection of data by the system.

Despite this, Jedi's infringement contentions simply ignore the additional limitation that the "pre-existing data" be *available* prior to initiation of collecting data for the user." (Ex. 2,'977 patent, Claim 1 (emphasis added).) Jedi's statement that data is simply "available" does not explain to whom or to what that data is available. For instance, Jedi claims that Facebook data associated with a user is "available" prior to the initiation of collection of data from that user by SpeedDate. (Jedi Br., Ex. D.) However, that user's Facebook data is not available – for any purpose – to the SpeedDate system prior to a user's granting SpeedDate access to such data. (Ex. 9, Facebook FAQs.) This step of granting access itself constitutes the "initiation" of collection of data from the user.

While Jedi claims that even though the system could not access this data until the user gave it explicit permission to do so, this data was somehow available – that is, it was in existence somewhere. This would be wrong, since simply equating the limitations that the data be "pre-existing" and that the data be "available prior to initiation of collecting data for the user," and effectively removing an entire limitation from the claim.

Further, the only embodiment of this claim described in the specification describes data "imported from, or exchanged with, preexisting database records, such as physical address, e-mail address, and ethnicity as a matter of public record, which may be input into the database." (Ex. 2, '977 patent at 12:55-58.) In such a scenario, this *publicly* available data was available for use by the system prior to the initiation of collecting data for the user.

As Jedi seeks to impermissibly negate an entire element from its claim as made apparent by its infringement contentions, SpeedDate's proper construction must be adopted.

Cooley LLP
Attorneys At Law
Palo Alto

27.

SpeedDate's Responsive Claim
Construction Brief
11-CV-00304-TUC-JGZ

**N.**   **"and thereby indicating interpersonal compatibility between the users"**

| Claim Term | SpeedDate's Construction | Jedi's Construction |
|---|---|---|
| "and thereby indicating interpersonal compatibility between the users" | and thereby indicating how well two users would be able to exist, live together, or work successfully with each other | Plain and ordinary meaning.  If the Court determines a proposed construction is necessary, Jedi proposes:<br><br>and thereby indicating compatibility between two or more people between the users |

As explained in Section IV.F, *supra*, the patentee specifically defined the term "compatible" in its Provisional Application to mean "able to exist, live together, or work successfully with (something or someone)."  (Ex. 7, Provisional Application at 6.)  SpeedDate's construction recognizes this express definition set forth by the patentee, while Jedi improperly fails to account for this.  Thus, the Court should adopt SpeedDate's construction of this term.

**O.**   **"publicly available"**

| Claim Term | SpeedDate's Construction | Jedi's Construction |
|---|---|---|
| "publicly available" | available to the system without any restrictions on access | Plain and ordinary meaning.  If the Court determines a construction is necessary, Jedi proposes: Available to the public. |

With regard to the final term, "publicly available," SpeedDate has provided a construction that comports with the intrinsic and extrinsic evidence.  In the context of claim 2 of the '977 patent, the term "publicly available" means "available to the system without any restrictions on access."

First, the claim is not concerned with publicly available *information*  but rather publicly available *data*.  That is, simply because a piece of information about

28.

a user, such as their address, is "publicly available," this does not mean that data representing that address is necessarily "publicly available" data, particularly depending on the source of such data.  A user may grant a system certain rights to access a database at Facebook, which contains data reflecting some publicly known and some non-publicly known information about the user.  If the system would not otherwise be able to access that data, it cannot be said to be publicly "available," as it was not available to the system.

In further support of SpeedDate's definition, the Microsoft Computer Dictionary defines the similar term "public files" to mean "files with no access restrictions."  (Ex. 10 at 364.)  Thus, one of ordinary skill of the art would have similarly found that public data would be "data with no access restrictions."  Thus, publicly available data would be data that is available to the system without any restrictions on access.

As Jedi's infringement contentions demonstrate its belief that data is "available to the public" even if a user must first grant access to the data, Jedi's construction must be rejected as contrary to the intrinsic record.

## V.   <u>CONCLUSION</u>

For the reasons set forth above, SpeedDate respectfully requests the Court enter a claim construction order adopting SpeedDate's proposed constructions.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

29.

SPEEDDATE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
11-CV-00304-TUC-JGZ

1

2
Dated:        January 31, 2012

3

4                                                   */s/ Heidi L. Keefe*
                                                    Heidi L. Keefe (*Admitted Pro Hac Vice*)
5                                                   COOLEY LLP
                                                    5 Palo Alto Square
6                                                   3000 El Camino Real
                                                    Palo Alto, California 94306
7                                                   Tel:  (650) 843-5000
                                                    Fax:  (650) 849-7400

8                                                   Sean D. Garrison (# 014436)
                                                    LEWIS & ROCA LLP
9                                                   40 No. Central Avenue
                                                    Phoenix, Arizona  85004
10                                                  Tel:  (602) 262-5311
                                                    Fax:  (602) 262-5747

11

12                                                  Attorneys for Defendant
                                                    SPEEDDATE.COM, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

30.

SPEEDDATE'S RESPONSIVE CLAIM
CONSTRUCTION BRIEF
11-CV-00304-TUC-JGZ